# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | |
|---|---|
| SARAH DOE; KIMBERLY DOE; RAQUEL DOE; ANNA ROE; BETH ROE; CONSTANCE ROE; EMILY ROE; AND GEORGINA ROE, on behalf of themselves and all others similarly situated,<br><br>           Plaintiffs,<br><br>v.<br><br>JERALD NEVELEFF, Immigration and Customs Enforcement (ICE) Contracting Officer; GEORGE ROBERTSON, ICE Contracting Officer's Technical Representative (COTR); JOSE ROSADO, ICE COTR; JOE BENAVIDES (ICE); WILLIAMSON COUNTY; JOHN FOSTER, Williamson County monitor; CORRECTIONS CORPORATION OF AMERICA (CCA); EVELYN HERNANDEZ, former CCA facility administrator; and DONALD DUNN,<br><br>           Defendants. | Cause No. 1:11-cv-907-LY |

## SECOND AMENDED COMPLAINT

# TABLE OF CONTENTS

INTRODUCTION.................................................................................................1

JURISDICTION AND VENUE.........................................................................3

PARTIES .............................................................................................................4

I.   Plaintiffs ......................................................................................................... 4

II.  Defendants ....................................................................................................... 9

     A.  ICE Defendants ........................................................................................ 9

     B.  Williamson County Defendants ............................................................. 10

     C.  CCA Defendants ..................................................................................... 10

FACTS...............................................................................................................11

I.   ICE Has a Well-Documented History of Failing To Protect Detainees in Its Custody from
     Sexual Assault and Is Indisputably Aware of the Ongoing Risk to Detainees.................... 11

II.  ICE Policies and Standards Demonstrate Its Awareness of the Obvious Risk of Sexual
     Assault on Immigrant Detainees by Officers and Employees, Notwithstanding ICE's
     Failure To Enforce These Standards and Policies. ............................................................. 18

III. Hutto's History of Non-Compliance and Assault Mandates the Already-Required
     Incorporation of Relevant Standards. .................................................................................. 19

IV.  Defendants Nevertheless Failed To Implement the Relevant Preventative Policies. .......... 23

V.   Donald Dunn Sexually Assaulted the Named Plaintiffs. .................................................... 26

     A.  Sarah Doe................................................................................................ 26

     B.  Kimberly Doe........................................................................................... 28

     C.  Raquel Doe............................................................................................... 30

     D.  Anna Roe ................................................................................................. 32

     E.  Georgina Roe ........................................................................................... 34

     F.  Emily Roe ................................................................................................ 35

     G.  Beth Roe .................................................................................................. 36

     H.  Constance Roe ......................................................................................... 38

VI.   Sexual Assaults Were Committed by Defendant Dunn or Other Male Transport Officers on Other Female Detainees. ................................................................................... 39

    A.  Assaults Charged by the State of Texas, Williamson County ...................................... 40

    B.  Additional Assaults Charged By the United States ...................................................... 40

       i.   Victim Dora Roe ..................................................................................................... 41

      ii.   Victim Faith Roe ..................................................................................................... 41

    C.  Numerous Potential Additional Victims of Donald Dunn .............................................. 41

    D.  Numerous Additional Potential Victims of Other Escort Drivers ................................. 42

VII.  ICE's Failure To Remedy Continued Risk of Sexual Assault at Hutto Generally, and Plaintiffs' Vulnerability to Deportation Specifically, Compounded Plaintiffs' Difficulty in Seeking or Obtaining Remedies for their Assaults. ............................................................. 42

    A.  Despite Its Public Statements and Despite the Efforts of Advocates, ICE Refused To Provide Adequate Information and Assistance to Dunn's Victims ............................... 44

    B.  Defendants Failed To Notify Victims of Dunn's Arrest or of the Release of Their Names ........................................................................................................................ 50

    C.  Defendants Failed To Advise Victims of the Availability of U Nonimmigrant Status and Relief From Deportation and Failed Promptly To Certify U Visa Applications .... 51

       i.   Kimberly Doe ........................................................................................................... 51

      ii.   Sarah Doe ................................................................................................................ 53

      iii.   Ms. Raquel Doe ...................................................................................................... 56

      iv.   Other Named Plaintiffs .......................................................................................... 59

VIII. Defendants CCA and Evelyn Hernandez Wrongfully Failed To Protect Plaintiffs from the Obvious Risk of Sexual Assault. ........................................................................................ 62

IX.   Defendants Williamson County and John Foster Wrongfully Failed To Protect Plaintiffs from the Obvious Risk of Sexual Assault. ........................................................................... 65

X.    ICE Defendants Neveleff, Robertson, and Rosado Wrongfully Failed To Protect Plaintiffs from the Obvious Risk of Sexual Assault. ........................................................................... 66

    A.  General Responsibilities of Defendant Neveleff ........................................................... 66

    B.  General Responsibilities of Defendants Robertson and Rosado .................................... 66

    C.  The ICE Defendants' Responsibilities with Respect to Transport Issues ..................... 67

    D.  The ICE Defendants' Responsibilities with Respect to Sexual Assault Issues ............. 68

    E.  The ICE Defendants' Failure To Carry out Their Responsibilities ............................... 69

XI.   Class Allegations ............................................................................................................... 69

CAUSES OF ACTION ............................................................................................... 72

**FIRST CAUSE OF ACTION**................................................................**72**

**SECOND CAUSE OF ACTION**..........................................................**73**

**THIRD CAUSE OF ACTION** ............................................................**74**

**FOURTH CAUSE OF ACTION** ........................................................**75**

**FIFTH CAUSE OF ACTION** .............................................................**76**

**SEVENTH CAUSE OF ACTION** ......................................................**77**

**EIGHTH CAUSE OF ACTION** ........................................................**80**

**NINTH CAUSE OF ACTION** ...........................................................**81**

**TENTH CAUSE OF ACTION** ...........................................................**81**

**DEMAND FOR JURY TRIAL**..........................................................**83**

**PRAYER FOR RELIEF**.....................................................................**83**

# __INTRODUCTION__

1.      On December 18, 2009, Defendant Donald Dunn, an Escort Officer and Resident Supervisor at the T. Don Hutto Residential Center ("Hutto") in Taylor, Texas, sexually assaulted both Plaintiff Anna Roe—a female immigrant detained by U.S. Immigration and Customs Enforcement ("ICE") at Hutto, who had fled from violent attacks in her home country of El Salvador by the hard-drinking father of her daughter, who had begun beating her repeatedly during her pregnancy—and Plaintiff Georgina Roe—a female immigrant detained at Hutto who came to the United States in an effort to seek refuge from frequent beatings and sexual abuse by her husband and others in her home country of Honduras.  On March 20, 2010, Defendant Dunn went on to commit sexual assault on Plaintiff Sarah Doe, a female immigrant detained at Hutto who had escaped repeated beatings and rapes by a military commander in her home country of Eritrea and sought asylum in the United States.  On that same date, Defendant Dunn also sexually assaulted Plaintiff Emily Roe, a female immigrant detained at Hutto who sought asylum in the United States after experiencing severe violence and sexual abuse at the hands of the father of her children in her home country of El Salvador.  On April 15, 2010, Defendant Dunn sexually assaulted Plaintiff Kimberly Doe, a female immigrant detained at Hutto, who had fled repeated beatings and rapes by her husband in her home country of Brazil and sought asylum in the United States.  On April 24, 2010, Defendant Dunn sexually assaulted Plaintiffs Beth Roe and Constance Roe, female immigrants detained at Hutto who had come to the United States from Honduras and Brazil respectively and who had both experienced rape or severe physical abuse in the past.  On May 6, 2010, Defendant Dunn sexually assaulted Plaintiff Raquel Doe, also a female immigrant detained at Hutto, who had desperately made her way to the United

States seeking refuge in the face of threats from those who had murdered her common-law husband in her home country of Guatemala.

2.      Dunn sexually assaulted each of these eight women and is known to have assaulted at least two other female immigrants between October 19, 2009, and May 7, 2010, when he transported them from the Hutto facility to either the Austin-Bergstrom International Airport (the "Airport") or the Greyhound Bus Station (the "Bus Station") after they were released from detention.  Defendant Dunn had the opportunity to assault these women because, contrary to the contracts governing the administration and management of Hutto and relevant ICE policies and standards, he alone was transporting them to their respective destinations without any other attending officer, much less one of the same gender as the transported detainee.

3.      Indeed, under its Intergovernmental Service Contract (the "IGSA") with Williamson County, the Texas county in which Hutto is located, ICE expressly required that "[d]uring all transportation activities, at least one (1) transportation officer shall be of the same sex as the residents being transported."  The contract between Williamson County and the Corrections Corporation of America ("CCA"), the private corporation in charge of managing the Hutto facility, expressly incorporated the terms of the IGSA.  Nevertheless, Defendants repeatedly violated this requirement by allowing male officers, such as Dunn, to transport female detainees without the presence of another officer, much less a female officer.  Dunn took advantage of these repeated violations by sexually assaulting numerous female detainees under his control during the course of transport.  The long history of rampant sexual abuse at ICE detention centers, coupled with the availability of the same opportunity Dunn exploited in the

form of at least 22 documented failures of other male officers to comply with the same policy, supports a reasonable inference that other male escort officers at Hutto engaged in similar abuse.

4.      The victimized women, all of whom had fled their home countries to escape extreme violence, and who were agonized and vulnerable from their journeys and from the disgusting conditions they experienced in holding cells and detention centers in the United States, were of necessity severely traumatized by these assaults.

5.      The Defendants, both individually and collectively, were directly responsible for the assaults and the resulting trauma in that they failed to implement and enforce the contracts, policies, and standards clearly and obviously designed to protect these women and others like them.

6.      Ms. Anna Roe, Ms. Georgina Roe, Ms. Sarah Doe, Ms. Emily Roe, Ms. Kimberly Doe, Ms. Beth Roe, Ms. Constance Roe, and Ms. Raquel Doe thus bring this action both on their own behalf as individuals and, with respect to their First, Second, Third, Fifth, Sixth, and Seventh causes of action, on behalf of a proposed Plaintiff Class of females who (1) were detained at the Hutto facility between October 19, 2009, and October 19, 2011, (the "Class Period"), (2) were provided a transport from Hutto during the Class Period by the Defendants, and (3) were assaulted, sexually assaulted, or sexually abused during the Class Period by a male officer or officers who provided that transport without any accompanying female officer.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over the federal claims in this action pursuant to 28 U.S.C. § 1331 because they arise under the Constitution and laws of the United States, and pursuant to 28 U.S.C. §§ 1343(a)(3) and (4) because they seek to redress the deprivation, under color of state law, of Plaintiffs' civil rights and to recover damages for the

violation of those rights.  This Court has supplemental jurisdiction to consider state causes of

action under 28 U.S.C. § 1367, as the state claims "form part of the same case or controversy" as

the federal claims over which the Court has jurisdiction.  This Court has subject matter

jurisdiction over the claims grounded in customary international law under 28 U.S.C. § 1350.

8.     In addition, this Court has subject matter jurisdiction over the federal and state

claims in this action pursuant to 28 U.S.C. § 1332 because diversity of citizenship exists between

the parties and the amount in controversy exceeds the jurisdictional threshold.

9.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2)

because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in

this district.

# **PARTIES**

## I.     **Plaintiffs**

10.     Plaintiff **Sarah Doe** is a native and citizen of Eritrea.  Having been repeatedly

beaten and raped by a military commander in her home country, she fled to the United States

seeking asylum.  Upon entering the United States for this purpose, she was detained and

transferred to the Hutto facility.  On the basis of a credible fear interview conducted at that

facility, her asylum claim was deemed sufficiently meritorious to allow her to seek release from

detention and to pursue that claim before the immigration court.  Defendants provided transport

to her from the facility to the Airport as part of the release process.  Due to the deliberate

indifference of Defendants to the obvious risk of sexual assault, Defendant Dunn transported her

in the early hours of the morning of March 20, 2010, without any other officers present, and took

advantage of this opportunity to assault her sexually.  Sarah reached the Airport, left the State of

Texas, and now resides elsewhere in the United States.  She suffered and continues to suffer

substantial injury as a result of Defendant Dunn's assault and the deliberate indifference of Defendants that proximately caused that assault.

11.     Plaintiff **Kimberly Doe** is a native and citizen of Brazil.  Having been repeatedly beaten and raped by her husband in her home country, she fled to the United States seeking asylum.  Upon entering the United States for this purpose, she was detained and transferred to the Hutto facility.  On the basis of a credible fear interview conducted at that facility, her asylum claim was deemed sufficiently meritorious to allow her to seek release from detention and to pursue that claim before the immigration court.  Defendants provided transport to her from the facility to the Airport as part of the release process.  Due to the deliberate indifference of Defendants to the obvious risk of sexual assault, Defendant Dunn transported her in the early hours of the morning of April 15, 2010, without any other officers present, and took advantage of this opportunity to assault her sexually.  Kimberly reached the Airport, left the State of Texas, and now resides elsewhere in the United States.  She suffered and continues to suffer substantial injury as a result of Defendant Dunn's assault and the deliberate indifference of Defendants that proximately caused that assault.

12.     Plaintiff **Raquel Doe** is a native and citizen of Guatemala.  When her common-law husband was murdered and she was threatened herself by his killers, she fled to the United States seeking refuge.  Upon entering the United States for this purpose, she was detained and transferred to the Hutto facility.  On the basis of a credible fear interview conducted at that facility, her asylum claim was deemed sufficiently meritorious to allow her to seek release from detention and to pursue that claim before the immigration court.  Defendants provided transport to her from the facility to the Airport as part of the release process.  Due to the deliberate indifference of Defendants to the obvious risk of sexual assault, Defendant Dunn transported her

in the early hours of the morning of May 6, 2010, without any other officers present, and took advantage of this opportunity to assault her sexually. Raquel reached the Airport, left the State of Texas, and now resides elsewhere in the United States. She suffered and continues to suffer substantial injury as a result of Defendant Dunn's assault and the deliberate indifference of Defendants that proximately caused that assault.

13.     Plaintiff **Anna Roe** is a native and citizen of El Salvador. Having been repeatedly beaten by the hard-drinking father of her daughter, who began this violent behavior during Anna's pregnancy, she fled to the United States. Upon entering the United States for this purpose, she was detained and transferred to the Hutto facility. On the basis of a credible fear interview conducted at that facility, her asylum claim was deemed sufficiently meritorious to allow her to seek release from detention and to pursue that claim before the immigration court. Defendants provided transport to her from the facility to the Bus Station as part of the release process. Due to the deliberate indifference of Defendants to the obvious risk of sexual assault, Defendant Dunn transported her in the early hours of the morning of December 18, 2009, without any other officers present, and took advantage of this opportunity to assault her sexually along with Plaintiff Georgina Roe. Anna reached the Bus Station, left the State of Texas, and now resides elsewhere in the United States. She suffered and continues to suffer substantial injury as a result of Defendant Dunn's assault and the deliberate indifference of Defendants that proximately caused that assault.

14.     Plaintiff **Georgina Roe** is a native and citizen of Honduras. Having come to the United States in an effort to seek refuge from frequent beatings and sexual abuse by her husband and others in her home country, she was detained and transferred to the Hutto facility. On the basis of a credible fear interview conducted at that facility, her asylum claim was deemed

sufficiently meritorious to allow her to seek release from detention and to pursue that claim before the immigration court.  Defendants provided transport to her from the facility to the Bus Station as part of the release process.  Due to the deliberate indifference of Defendants to the obvious risk of sexual assault, Defendant Dunn transported her in the early hours of the morning of December 18, 2009, without any other officers present, and took advantage of this opportunity to assault her sexually along with Plaintiff Anna Roe.  Georgina reached the Bus Station, left the State of Texas, and now resides elsewhere in the United States.  She suffered and continues to suffer substantial injury as a result of Defendant Dunn's assault and the deliberate indifference of Defendants that proximately caused that assault.

15. Plaintiff **Emily Roe** is a native and citizen of El Salvador.  Having come to the United States after experiencing severe violence and sexual abuse at the hands of the father of her children in her home country, she was detained and transferred to the Hutto facility.  On the basis of a credible fear interview conducted at that facility, her asylum claim was deemed sufficiently meritorious to allow her to seek release from detention and to pursue that claim before the immigration court.  Defendants provided transport to her from the facility to the Airport as part of the release process.  Due to the deliberate indifference of Defendants to the obvious risk of sexual assault, Defendant Dunn transported her in the early hours of the morning of March 20, 2010, without any other officers present, and took advantage of this opportunity to assault her sexually.  Emily reached the Airport, left the State of Texas, and now resides elsewhere in the United States.  She suffered and continues to suffer substantial injury as a result of Defendant Dunn's assault and the deliberate indifference of Defendants that proximately caused that assault.

16.     Plaintiff **Beth Roe** is a native and citizen of Honduras.  Having come to the United States after she was raped and experienced other severe hardships, she was detained and transferred to the Hutto facility.  On the basis of a credible fear interview conducted at that facility, her asylum claim was deemed sufficiently meritorious to allow her to seek release from detention and to pursue that claim before the immigration court.  Defendants provided transport to her from the facility to the Airport as part of the release process.  Due to the deliberate indifference of Defendants to the obvious risk of sexual assault, Defendant Dunn transported her in the early hours of the morning of April 24, 2010, without any other officers present, and took advantage of this opportunity to assault her sexually, along with Plaintiff Constance Roe.  Beth reached the Airport, left the State of Texas, and now resides elsewhere in the United States.  She suffered and continues to suffer substantial injury as a result of Defendant Dunn's assault and the deliberate indifference of Defendants that proximately caused that assault.

17.     Plaintiff **Constance Roe** is a native and citizen of Brazil.  Having come to the United States to escape her extremely violent and abusive common-law husband in her home country, she was detained and transferred to the Hutto facility.  On the basis of a credible fear interview conducted at that facility, her asylum claim was deemed sufficiently meritorious to allow her to seek release from detention and to pursue that claim before the immigration court.  Defendants provided transport to her from the facility to the Airport as part of the release process.  Due to the deliberate indifference of Defendants to the obvious risk of sexual assault, Defendant Dunn transported her in the early hours of the morning of April 24, 2010, without any other officers present, and took advantage of this opportunity to assault her sexually, along with Plaintiff Beth Roe.  Constance reached the Airport, left the State of Texas, and now resides elsewhere in the United States.  She suffered and continues to suffer substantial injury as a result

of Defendant Dunn's assault and the deliberate indifference of Defendants that proximately caused that assault.

## II.    Defendants

18.    Jerald Neveleff, George Robertson, and Jose Rosado (the "ICE Defendants") acted under color of federal law with respect to all matters alleged in this Complaint, as did Defendant Joe Benavides.  All other Defendants acted under color of state law with respect to all matters alleged in this Complaint.

19.    Defendant CCA is not in contractual privity with the federal government in connection with the services it provides at Hutto.  CCA contracts directly with Williamson County.  For all relevant purposes, CCA and its employees are state actors and derive their authority from Williamson County, a political subdivision of the State of Texas.

20.    All individual Defendants are sued only in their individual capacities.

### A.    ICE Defendants

21.    Defendant **Jerald Neveleff** was at all times relevant to this action the Contracting Officer at ICE responsible for administering the contract between ICE and Williamson County governing the detention of female immigrant detainees at Hutto.  As Contracting Officer, Defendant Neveleff was directly and personally responsible for ensuring proper administration of the contract after award, including approving and securing adherence to relevant policies and practices required by or grounded in that contract.  He was directly involved with requesting and scheduling transport activities.

22.    Defendant **George Robertson** was the Contracting Officer's Technical Representative ("COTR") from the beginning of the Class Period until April 23, 2010.  As COTR, he was tasked with, among other things, monitoring technical aspects of the

administration of the contract between ICE and Williamson County governing the detention of female immigrant detainees at Hutto.  He was directly involved with requesting and scheduling transport activities.

23.     Defendant **Jose Rosado** was the COTR from April 23, 2010, until the end of the Class Period.  As COTR, he was tasked with, among other things, monitoring technical aspects of the administration of the contract between ICE and Williamson County governing the detention of female immigrant detainees at Hutto.  He was directly involved with requesting and scheduling transport activities.

24.     Defendant **Joe Benavides** was an employee of ICE who was directly involved in interviewing and serving as point of contact for most, if not all, of the named Plaintiffs in this litigation after ICE began participating in an investigation of Defendant Donald Dunn.

**B.     Williamson County Defendants**

25.     Defendant **Williamson County** is a political subdivision of the State of Texas located within the Western District of Texas.  At all relevant times, Williamson County contracted directly with, and received federal funds from, ICE for the housing of federal detainees within the Hutto facility.  Williamson County is a "person" for purposes of 42 U.S.C. § 1983.

26.     On information and belief, Defendant **John Foster** was, during all or some of the Class Period, the Williamson County monitor for the Hutto facility, tasked with ensuring compliance with the contractual provisions governing the detention of female immigrant detainees at the Hutto facility.

**C.     CCA Defendants**

27.     Defendant **CCA** is a corporation incorporated under the laws of Maryland and has its principal place of business in Nashville, Tennessee.  Defendant CCA managed the Hutto facility during all time periods relevant to the allegations in this Complaint.

28.     Defendant **Evelyn Hernandez** was, during all time periods relevant to the allegations in this Complaint, an employee of CCA and the facility administrator of the Hutto facility.

29.     Defendant **Donald Dunn** was, during all time periods relevant to the allegations in this Complaint, an employee of CCA with the title of Escort Officer and Resident Supervisor at the Hutto facility.  His employment was terminated on May 24, 2010.

# FACTS

## I.     ICE Has a Well-Documented History of Failing To Protect Detainees in Its Custody from Sexual Assault and Is Indisputably Aware of the Ongoing Risk to Detainees.

30.     ICE detains hundreds of thousands of people each year.  In 2005, the Department of Homeland Security ("DHS") announced a shift in immigration and detention policy from "catch[ing] and releas[ing]" to "catch[ing] and detain[ing]" immigrants.  Accordingly, the number of detainees in ICE custody has skyrocketed in recent years, rising from under 200,000 per year in 2005 to over 400,000 per year in 2010.  On information and belief, approximately 10% of these detainees are women.

31.     Individuals in ICE detention are civil detainees.  The majority of them have committed no crime other than at most that of entering the United States without inspection—a misdemeanor offense—and many have fled violence or persecution in their home countries and are seeking asylum in the United States.  ICE detainees are not serving criminal sentences and are not placed in detention for the sake of punishment, but rather to restrain their movement in

the United States until their applications for status to remain in this country have been adjudicated. Detainees who demonstrate a credible fear of persecution if they are returned to their home countries are eligible for release from detention during the pendency of their asylum proceedings.

32.     ICE houses the detainees in its custody at a variety of facilities spread throughout 28 states. Some of the facilities are owned and operated by ICE. Many are owned by local government entities or private prison contractors and are operated under contract with those entities. According to ICE websites, eleven of these detention centers are in Texas, including the Hutto facility at issue in this Complaint.

33.     ICE has long possessed information that the detainees in its custody are subject to high risk of sexual assault. As early as 1998, ICE's predecessor, the Immigration and Naturalization Service ("INS"), was defending lawsuits brought by immigration detention center residents alleging rampant sexual abuse (*see, e.g.*, *Jama v. U.S. I.N.S.*, 22 F. Supp. 2d 353 (D.N.J. 1998)) and was involved in investigations of employees accused of such abuse (*see, e.g.*, *U.S. v. Akram*, 152 F.3d 698 (7th Cir. 1998)).

34.     In 2000, the Women's Commission for Refugee Women and Children documented widespread sexual abuse of detainees at the INS Krome Service Processing Center in Miami, Florida.[1] According to the Commission, "[w]omen at Krome reported that often officers used the women's lack of immigration status as an inducement to participate in sexual activities [and] that officers would make false promises that they could release a woman from detention if she participated in sexual acts."[2] In other cases, "detainees said that deportation officers threatened them with deportation or transfer to a county prison if they resisted a guard's

---

[1] *See* http://womensrefugeecommission.org/press-room/557-sexual-abuse-widespread-at-krome-detention-center-miami-refugee-women-and-immigrants-subjected-to-.

[2] *Id.*

sexual advances or if they complained."[3]  A Department of Justice investigation in 2000 revealed that "roughly 10 percent of female detainees at Krome had come forward with reports of sexual misconduct by INS officers that included sexual harassment, fondling during searches, and sexual assault."[4]  According to the National Prison Rape Elimination Commission, "[t]wo women were impregnated by officers during their time at Krome."[5]  In 2002, Christina Madrazo, a former detainee at the Krome facility, brought a lawsuit alleging that an INS guard had raped her during her detention.[6]  Reports of sexual assault by officers on detainees at Krome have continued until at least as recently as 2008.[7]

35.     In 2002, Tony Hefner, a former security guard at the Port Isabel Service Processing Center in Los Fresnos, Texas, published *Between the Fences: Inside a U.S. Immigration Camp*, in which he detailed a wide variety of instances in which detention officers either solicited sexual favors in exchange for preferential treatment or other considerations or simply forced detainees to have sex.[8]  Hefner recounted having received a memo on this topic from the Supervisor of Detention and Deportation at the facility which stated:

> It is only when [detainees] realize that the predators threatening their dignity and human rights are (the ones) keeping them detained, do they start to panic. . . . All paperwork that a detainee signs, (advises) him/her that they [sic] will be protected during their deportation process.  But, the unofficial understanding informs them, you do what I tell you, or order you to do, and everything will be okay.  The most common threat is, cooperate, or I will deport you.[9]

---

[3] *Id*.
[4] National Prison Rape Elimination Commission Report, June 2009, at 175.
[5] *Id*.
[6] Alisa Solomon, *Nightmare in Miami*, The Village Voice, March 19, 2002.
[7] *See* http://correctionofficersgoingwrong.wordpress.com/2008/04/06/ex-fed-agent-pleads-guilty-in-sex-assault-case/.
[8] Tony Hefner and Jacalyn McLeod, *Between the Fences: Inside a U.S. Immigration Camp* (2002), pp. 14-16, 28-32, 36-40, 45-49, 59-67, 89-90, 92-94.
[9] *Id*., p. 29.

36.      In 2003, an ICE agent was arrested and charged with felony sexual assault for raping a young female immigrant detainee at an Arkansas motel where he took her instead of bringing her to the doctor as he had been instructed to do.[10]

37.      On September 4, 2003, Congress enacted the Prison Rape Elimination Act ("PREA"), in which it specifically found, among other things, that (1) "[t]he high incidence of sexual assault within prisons involves actual and potential violations of the United States Constitution," (2) "the Supreme Court ruled that deliberate indifference to the substantial risk of sexual assault violates prisoners' rights under the Cruel and Unusual Punishments Clause of the Eighth Amendment," and (3) that "States that do not take basic steps to abate prison rape . . . demonstrate such indifference."  42 U.S.C. § 15601.  On information and belief, many of the factors that lead to a high incidence of sexual assault in prisons are present in immigrant detention facilities as well, such that the above-referenced Congressional findings served as alerts and admonitions to all governmental and private entities involved in the administration and management of such detention facilities.  As discussed below, ICE itself recognized this fact and had incorporated PREA into its standards by December 2007.

38.      In 2004, Stop Prisoner Rape,[11] an organization later lauded by the National Prison Rape Elimination Commission as having played a pivotal role in its public hearings,[12] published *No Refuge Here: A First Look at Sexual Abuse in Immigration Detention*, a study on ICE's failure to prevent a multitude of instances of sexual abuse in its facilities.  The study recounted numerous reports of sexual abuse of detainees by officers at immigration detention centers.

39.      In July 2006, the United Nations Committee Against Torture expressed its concern about "reliable reports of sexual assault of . . . persons in . . . immigration detention [in

---

[10] *See* http://spr.igc.org/en/news/2003/0924-3.html.
[11]  Since 2008, Stop Prison Rape has been known as Just Detention International.
[12]  National Prison Rape Elimination Commission Report, June 2009, at xiii.

the United States and by] the lack of prompt and independent investigation of such acts and that

appropriate measures to combat these abuses have not been implemented by the [United

States]."[13]

     40.    Rampant sexual assault and abuse of immigrants in ICE custody continued.

     41.    For example, in December 2006, the Office of the Inspector General in the

Department of Homeland Security reported the firing of a guard following the investigation of

allegations by a woman detained at an immigrant detention center managed by CCA in San

Diego that the guard had raped her while the detainee was on work detail.[14]

     42.    In May 2007, a guard at Hutto—the very facility at issue in this Complaint—was

seen crawling out of a detainee's cell at night in an apparent attempt to avoid video cameras.  At

the time, Hutto was used for family detention.  Remarkably, the guard allegedly sexually

assaulted the detainee while her son was sleeping in his crib inside the cell.  CCA fired the guard

and reported this incident to ICE as required by the terms of its contract by submitting a

"Contract Discrepancy Report" to Williamson County on May 26, 2007, copying ICE's

Contracting Officer and COTR for Hutto.[15]  Not only did ICE have information about rampant

occurrences of sexual assault by officers and employees on detainees at immigration detention

centers in general, therefore, but ICE had information about such abuse at Hutto itself.

---

[13] United Nations, Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Committee Against Torture, Thirty-sixth Session, Consideration of Reports Submitted by States Parties Under Article 19 of the Convention, United States of America, ¶ 32.

[14] Office of Inspector General, *Treatment of Immigrant Detainees Housed at Immigration and Customs Enforcement Facilities*, December 2006, p. 28.

[15] The guard was never prosecuted because federal criminal law at that time prohibited only sexual contact between Department of Justice employees and those in their custody.  The Department of Homeland Security, created in 2003, was not subject to the same statutory regulations.  The law has since been amended.  *See* 18 U.S.C.A. § 2243(b).

43.     In April 2008, a former ICE agent pleaded guilty to having sex with a detainee while transferring her from one detention center to another in Florida.[16]

44.     In October 2008, a contract security officer reportedly sexually assaulted a female detainee awaiting deportation at the Willacy Processing Center.  The officer who was the subject of the 2008 report was recently charged with and pleaded guilty to sexual assault of a detainee and is awaiting sentencing as of the date of this Complaint.[17]

45.     In December 2008, widespread allegations surfaced of guards at the Pearsall immigrant detention center in Texas sexually assaulting detainees.[18]

46.     In June 2009, the National Prison Rape Elimination Commission, a commission created by Congress pursuant to PREA to study prison rape and recommend relevant prison standards designed to prevent it, published a report noting that accounts of sexual abuse of detainees by immigration detention center staff had been coming to light for more than twenty years and detailing the many factors contributing to the particular vulnerability of such detainees to this type of abuse.  In particular, the commission reported that

> [b]ecause immigration detainees are confined by the agency with the power to deport them, officers have an astounding degree of leverage—especially when detainees are not well informed of their rights and lack access to legal counsel.  The Commission learned that officers have propositioned women whose cases they control, telling them that if they want to be released they need to comply with their sexual demands.  The fear of deportation cannot be overstated and also functions to silence many individuals who are sexually abused.[19]

47.     In the summer of 2009, an NGO received numerous reports of sexual assault at the Willacy Detention Center.  The complaints were reported to ICE, and ICE deployed Dora Shriro, a Special Advisor on Detention and Removal, to visit the facility.

---

[16]  *Ex-Fed Agent Pleads Guilty in Sex-Assault Case*, The Miami Herald, Apr. 3, 2008.
[17]  http://www.justice.gov/opa/pr/2011/August/11-crt-1016.html.
[18]  Brian Collister, *More Sex Assault Allegations at Immigrant Detention Center*, WOAI.com, Dec. 29, 2008.
[19]  Report at 22.

48.     In September 2009, a former contract guard at the Port Isabel immigrant detention center in Texas admitted to forcing a number of female detainees to strip in isolation cells at the center and assaulting them.[20]

49.     In the fall of 2009, ICE published a report by Dora Shriro entitled "Immigration and Detention Overview and Recommendations."  The federal government promoted the report as a blueprint for forthcoming reforms.  In a section titled "Special Populations," the report set forth numerous recommendations for the treatment of female detainees, including that the population of women in ICE custody should be consolidated in facilities "modified to meet their special requirements for safety and well-being."  The report observed that numerous facilities housing women were staffed primarily by men and recommended that female staff should be assigned to supervise the female population.  The report also recommended that the use of segregation or isolation cells for women should be discontinued immediately.  Finally, the report noted that the recent transition of the Hutto facility from a family detention center to a facility housing all female detainees "will enable ICE to implement gender-specific recommendations and assess their affects before implementing gender-specific recommendations as part of a national plan."

50.     Despite this long history of rampant sexual assault and perennial admonitions as to the necessity of change, there were at least 185 allegations of sexual abuse noted in ICE, DHS Office of Inspector General, and DHS Office of Civil Rights and Civil Liberties documents for one recent four-year period.  Of these, at least 56 reports concerned detainees in Texas.

51.     Moreover, according to data received through Freedom of Information Act requests, the DHS Office of the Inspector General and ICE together investigated at least 54

---

[20] Mary Flood, *Ex-Prison Guard Admits to Fondling Immigrant Women*, The Houston Chronicle, Sept. 24, 2009.

incidents of alleged sexual harassment, contact, and/or assault perpetrated by ICE officers or staff on detainees in ICE custody in the three years preceding December 18, 2009, the date of Donald Dunn's first known assault on a female immigrant detained at Hutto.  At least 32 (or more than half) of these incidents took place in Texas.  At least 4 of these incidents took place at the Hutto facility itself.  At least 3 of these incidents involved an officer, agent, or staff member sexually assaulting an immigrant detainee during transport to or from an immigration detention center.

52.     In light of the numerous reports of sexual abuse and assault over the course of decades, ICE and its officials and employees were inarguably acutely aware of the relevant risks female immigrant detainees faced from detention center officers and staff.

## II.     ICE Policies and Standards Demonstrate Its Awareness of the Obvious Risk of Sexual Assault on Immigrant Detainees by Officers and Employees, Notwithstanding ICE's Failure To Enforce These Standards and Policies.

53.     In December 2007, ICE issued policies and standards incorporating PREA and announced that ICE would exhibit zero tolerance towards sexual assault and abuse.  ICE/DRO Residential Standard: Sexual Abuse and Assault Prevention and Intervention, dated December 21, 2007.  The applicable standard specifically observes that:

> [r]esearch indicates that a small percentage of individuals express aggression and seek to dominate others through violent sexual behavior.  Forceful and pressured sexual interactions are among the most serious threats to resident safety and institutional order.  Victims may suffer physical and psychological harm, and could be infected with a life-threatening disease. . . . Not only does ICE/DRO expect all facilities to affirmatively act to prevent sexual abuse and assaults on ICE/DRO residents, but it also takes very seriously all allegations of sexual misconduct and assault against any ICE/DRO resident in any facility.  Every allegation is reviewed and, where warranted, referred for criminal prosecution, with a 'zero tolerance' standard.  *Id.*

54.     Moreover, aware that officers and staff had positions of such authority and control that they could carry out acts of sexual assault and abuse against immigrant detainees with

greater ease and less likelihood of repercussions, ICE developed standards specifically

prohibiting officers and staff from "[e]ngaging in, or attempting to engage in a sexual act with

any resident or the intentional touching of [a] resident's genitalia, anus, groin, breast, inner thigh,

or buttocks with the intent to abuse, humiliate, harass, degrade, arouse, or gratify the sexual

desire of any person" and noting that "[s]exual acts or contacts between a resident and a staff

member, even when no objections are raised, are prohibited acts." *Id.* at § V.D.2.

     55.     ICE fully understood the threat of sexual assault during transport, noting in

relevant transportation standards that "[w]hen transporting residents of the opposite gender, it is

good practice for staff to call in their time of departure and odometer reading and then do so

again upon arrival, to account for their time." ICE/DRO Residential Standard for Transportation

(By Land), § IV.S.11 (dated December 21, 2007).

## III.    Hutto's History of Non-Compliance and Assault Mandates the Already-Required Incorporation of Relevant Standards.

     56.     Hutto is a contract detention facility in Taylor, Texas, operated by CCA.  CCA is

the largest private, for-profit provider of detention and corrections services for adults in the

United States.

     57.     The federal government reportedly pays CCA, through Williamson County,

approximately $2.8 million per month to house a minimum of 461 detainees per day.

     58.     Williamson County reportedly charges CCA an administrative fee of

approximately $15,000.00 per month.  In addition, CCA pays Williamson County $6,000/month

to defray the costs of the Williamson County representative hired to serve as the County's

monitor for an annual total of $72,000.00.

     59.     CCA owns the Hutto facility and the land upon which it sits.  CCA bought the

land in 1996, during the first wave of private prison expansion, and constructed the facility in

1997 with the intention of housing federal inmates.  The federal government pays a higher per

diem than other custodial entities and as a result its contracts are the most lucrative and the most

highly prized.  By 2004, however, CCA's stock had dropped and the company was facing

bankruptcy as result of over-building, mismanagement, and a number of deaths and riots at its

prisons.[21]  CCA deemed Hutto underutilized and was planning to shut it down when, in 2005, the

federal government announced a request for proposals for a facility to detain immigrant

families.[22]  CCA won the contract and began housing immigrant families at the Hutto facility

pursuant to an Intergovernmental Service Agreement with ICE, through Williamson County, in

May 2006.

      60.     Shortly after Hutto was re-opened as a facility to house detained immigrant

families, immigration attorneys with clients at the facility began to report serious concerns about

the treatment of the detainees, particularly the children, incarcerated there.  On March 7, 2007,

the ACLU, ACLU of Texas, University of Texas Immigration Clinic, and Dewey and LeBoeuf

LLP filed a federal lawsuit on behalf of ten children who were detained with one or both of their

parents at Hutto.  *In re Hutto Family Detention Center*, No. A-07-CA-164-SS (W.D. Tex.,

Austin Div. – Sparks, J.).  The suit, which ultimately included 26 plaintiffs, alleged numerous

violations of the settlement agreement to which ICE's predecessor agency, Immigration and

Naturalization Services ("INS"), was bound in *Flores v. Meese*, No. 85-cv-4544 (C.D. Cal., Nov.

1997) ("*Flores* Settlement").  The *Flores* Settlement established minimum standards and

conditions for the housing and release of all minors in federal custody.  The plaintiffs claimed

that the following conditions at Hutto, among other things, violated the *Flores* Settlement: the

placement of children in a punitive setting, including forcing them to wear prison garb and

---

[21]  Getahn Ward, *CCA Brings Old Hand Back to Operation*, The Tennessean, December 16, 2004.
[22]  Getahn Ward, *Immigration Crackdown Creates New Profit Opportunity for CCA*, The Tennessean, May 21, 2006.

housing them in locked cells with exposed toilets, cameras and lasers to monitor movement out

of the cell, and lights that were left on all night for monitoring; seven-times-daily lockdowns for

"counts;" the denial of food and nutrition adequate to support growing children; the denial of

education; the deprivation of outdoor recreation; the denial of access to counseling, education,

and other services; the disciplining of children for playing, running around, or engaging in

similar activities; the use of separation of children from their parents as a disciplinary threat to

force behavior compliance; and the use of separation of children from parents as a threat to force

parents to sign deportation orders instead of pursuing claims for immigration relief in the United

States.

61.    As noted above, in May 2007, during the pendency of the *In Re Hutto Family*

*Detention Center* litigation, a guard employed by CCA at the Hutto facility was discovered to

have stolen into a detainee's cell and had sex with her while her child was present.  The guard

was subsequently terminated from employment but not criminally charged.

62.    In a November 2008 Annual Compliance Review, DHS found the Hutto facility

"not-compliant" with respect to applicable ICE standards regarding sexual abuse and assault

prevention and intervention.

63.    On August 27, 2009, the parties in the *In Re Hutto Family Detention Center*

litigation entered into a settlement agreement (the "Hutto Settlement Agreement") pursuant to

which ICE agreed to make numerous, substantial changes to the conditions of confinement for

children at the facility.  The Hutto Settlement Agreement included a two-year compliance

monitoring period and designated Magistrate Judge Andrew Austin as the monitor.

64.    Shortly before the Hutto Settlement Agreement terminated on August 27, 2009—

as part of a much-publicized announcement that the federal government was moving to

substantially overhaul and improve the nation's troubled immigration detention system—ICE officials announced that ICE would cease detaining families at the facility and voluntarily agreed to extend the terms of the Hutto Settlement Agreement until all families were transferred out of the facility.  On information and belief, the transfer was completed by September 17, 2009.

65.     Shortly thereafter, ICE began using the Hutto facility exclusively to house immigrant women.  Soon, ICE began touting Hutto as a model facility, dedicating a page on ICE's website specifically to Hutto and regularly citing the facility as exemplary in meetings with NGOs and immigrants' rights advocates.

66.     ICE incorporated the 2007 sexual assault and abuse prevention standards into its Intergovernmental Service Agreement with Williamson County governing the administration of the newly configured Hutto facility (DROIGSA 10-0002; the "IGSA").  In this IGSA, ICE specifically required that "[d]uring all transportation activities, at least one (1) transportation officer shall be of the same sex as the residents being transported."  Williamson County, in turn, incorporated the terms of the IGSA into its contract with CCA setting out the terms by which CCA would operate the Hutto facility.  The latter contract is by its own terms "governed by and construed in accordance with the laws of the State of Texas[.]"  CCA Agreement, ¶ 15.

67.     In an October 6, 2009, Fact Sheet issued in conjunction with Dora Shriro's Report and the government's announcement that it was overhauling its civil detention system, ICE announced that "[e]ffective immediately, [it would] aggressively monitor and enforce contract performance in order to ensure contractors [would] comply with terms and conditions— especially those related to conditions of confinement."  As part of this effort, ICE further announced its "intent to hire 23 federal employees to provide on-site oversight at ICE's largest detention facilities."  According to an August 12, 2010, Fact Sheet published by ICE, part of the

training for all of these "detention service managers" took place between March 22, 2010, and April 9, 2010, at the Hutto facility itself.  ICE ostensibly assigned one of these detention service managers to Hutto in April 2010 after the conclusion of this training.

68.     ICE's actions with respect to incorporating relevant standards, insisting on aggressive monitoring and enforcement of contract provisions, and appointing new oversight officers bespoke a recognition that the risks of sexual assault on immigrant detainees by detention center officers and employees during transport, both at Hutto and elsewhere, were real and obvious and that ICE and those contracting with ICE had the responsibility to prevent such assaults.

## IV.     Defendants Nevertheless Failed To Implement the Relevant Preventative Policies.

69.     Notwithstanding the chronic reports of sexual assault against detainees in ICE custody by staff at ICE immigration detention centers, the ever-increasing visibility of and publicity surrounding such assaults, and ICE promises to enforce contract terms aggressively, Defendants failed to ensure compliance with the terms of the IGSA governing transports and sexual assault prevention at Hutto.

70.     As just one example, Defendants failed to issue or to ensure the issuance of general orders to officers and employees transporting detainees which were consistent with and reflected the relevant ICE policies and standards.  ICE/DRO Residential Standards provide that Post Orders, which govern facility employee conduct and job duties, provide "step-by-step procedures in sufficient detail to guide a staff member assigned to that post for the first time." On March 13, 2009, CCA issued Policy 9-101, which clearly mandated that "[o]nly staff of the same gender as the residents being transported will be assigned to transport residents that bond out."  However, just a week later, on March 20, 2009, CCA issued Post Order 17, entitled

"Transportation," which purported to govern the transportation of residents offsite, but did not specify by its own terms and procedures that at least one female officer escort any female detainee in any transport. Post Order 17 did not provide sufficient detail, or indeed any detail at all, with respect to the requirement clearly mandated by ICE's policy that at least one female officer escort any female detainee in any transport. Such omissions and oversights were no mere matter of muddled paperwork. On the contrary, under the circumstances in which Defendants provided transport to female detainees and in the face of their clear understanding of the obvious risks presented by those circumstances, these omissions and oversights constituted deliberate indifference to the obvious risk of sexual assault on female detainees.

71. Defendants exhibited this deliberate indifference in the face of conditions in which the need for their constant attention to these issues was particularly acute. Escort officers were in such complete control of all aspects of the transport that they unquestionably had every opportunity to "express aggression and seek to dominate others through violent sexual behavior" in the manner warned of in the applicable ICE standards referenced above. Not only were escort officers in complete control of the transported detainees, but they alone understood the geographical details of the locale generally and of the route to be taken specifically. The escort officers, of course, spoke English, a language unfamiliar to many of the detainees, and, unlike the detainees, could fluently communicate with anyone with whom they had cause to interact. The escort officers had the trappings of authority that would tend to prevent any challenge to their actions either from the transported detainees themselves or from any possible local bystanders. Finally, they were transporting the detainees to the airport or the bus station, from which the detainees would immediately leave the area. The detainees would have little time to report any incidents, would have great difficulty reporting such incidents in any event due to

communication difficulties, and would not remain in the area long enough to assist with any investigation of such incidents. Indeed, such detainees might ultimately face deportation and be forced to leave the country altogether.

72.     Despite such indicators of the obvious risk of sexual assault on transported detainees by escort officers and employees, Defendants did not implement the preventative measures called for by the relevant contracts and by ICE policies and standards. On the contrary, on numerous occasions a single male officer transported female detainees in contravention of the IGSA and relevant ICE policies and standards. In fact, according to information received from Defendant Williamson County, on at least 46 occasions between October 19, 2009, and May 6, 2010, a single male officer transported a single female detainee. On at least 14 of these occasions, the transport occurred entirely or in part between midnight and 6 a.m., a time of day in which, on information and belief, the route to the Airport was dark, the roads were deserted with little vehicular and no pedestrian traffic, businesses were closed, and there was generally nothing likely to occur in the course of a transport that would interfere with an escort officer's ability to abuse his authority and control of the situation. Of the 46 or more occasions in which a single male officer transported a single female detainee between October 19, 2009, and May 6, 2010, at least 44 involved transport to an airport or bus station, compounding the difficulties that any transported detainee would have in reporting any incident.

73.     On at least 31 other occasions between October 19, 2009, and May 7, 2010, a single male officer transported multiple female detainees. On at least 7 of these occasions, the transport occurred entirely or in part between midnight and 6 a.m. At least 30 of the 31 occasions involved transport to an airport or bus station.

74.     In sum, during the Class Period, at least 22 distinct male officers were involved in the at least 77 transports in which a single male officer escorted female detainees without a female escorting officer present.

## V.     Donald Dunn Sexually Assaulted the Named Plaintiffs.

75.     Defendant Donald Dunn, a CCA employee at the Hutto facility from the beginning of the Class Period until May 24, 2010, with the title of Escort Officer and Resident Supervisor, transported female detainees to the Airport or bus station during the Class Period with no other accompanying officer on at least 11 occasions.  On at least 10 of these occasions, the transport occurred entirely or in part between midnight and 6 a.m.

76.     Defendant Dunn took advantage of the extreme level of control Defendants' deliberate indifference allowed him to exercise over these transports and the transported detainees to commit sexual assault against each of the named plaintiffs and at least two other women.

### A.     Sarah Doe

77.     Plaintiff Sarah Doe, a 24-year-old native and citizen of Eritrea, was forcibly conscripted and sent to Sawa military training camp at the age of 21 to finish her education and begin mandatory military service.  While at the camp, she was beaten and raped repeatedly by a military commander.  She felt helpless to escape his abuse while at the camp, as he had almost unlimited authority to act as he chose there.  She felt helpless to escape the camp itself, as her country imposes severe punishments on those who attempt such escapes.

78.     Having finally found a mechanism for escape in October 2008, she made every effort to reach a country where pursuing Eritrean military authorities could not punish her flight from the extreme abuse she had suffered.  She fled from Eritrea on foot through the Sudan and

into its capital Khartoum, from Khartoum via plane to Dubai, then from Dubai to Moscow, Russia, from Moscow to Cuba, from Cuba to Ecuador, and from Ecuador through Guatemala to Mexico in the hopes of reaching the United States—a place in which, given its democratic traditions and its general reputation among her fellow travelers, she trusted she could find the security asylum would bring.

79.     Confident in the merits of her application for asylum, Sarah did not attempt to escape when immigration officers detained her group upon crossing the border between Mexico and the United States in February 2010.  Her confidence in this regard proved well-founded when an asylum officer interviewed her and found prima facie evidence in support of her claim, allowing her to be released from the Hutto detention facility on March 20, 2010.

80.     However, en route to the Hutto facility, she was confined in holding cells under conditions worse than any she had experienced in all her long travels.  She began to feel as though the American immigration officials who had her in their custody and control did not care whether she was cold, hungry, or facing other difficulties.

81.     Although filled with trepidation based on her experiences in her home country and in the United States up to that point, Sarah was nevertheless overjoyed when she learned she could bond out of the Hutto facility in which she was ultimately detained.  She looked forward to joining family members elsewhere in the United States while awaiting final resolution of her asylum application.  When a CCA employee led her at 3:58 a.m. on March 20, 2010, to meet Defendant Donald Dunn for purposes of transporting her to the Airport, she assumed that both officers would escort her during that trip.  When she was locked in the cage-like rear of Dunn's van, however, and realized that only Dunn would transport her, her apprehensions escalated rapidly.

27

82.     When Defendant Dunn stopped a mere ten miles into the trip and for no apparent purpose at the JD's Conoco Station located at 20306 FM 973, Coupland, Texas 78615 (the "Conoco Station") and demanded that Sarah get out of the van, take off her jacket, and press up against the wall of the Conoco Station, her fears quickly turned to panic.  Defendant Dunn groped her for an extended period of time, touching all over her body, including her breasts, crotch area, and buttocks.  When he demanded that she re-enter the van, this time in the front seat, she believed that he intended to take her somewhere else to rape her.  Memories of her previous rapes in her home country made her terror complete.

83.     When Dunn dropped Sarah off at the Airport, she fled immediately to escape this new attacker.  She had received no information while in detention at the Hutto facility on her rights and remedies with respect to sexual assault and, in any event, felt so unsafe and terrified that she did not report the incident.

84.     Sarah suffered and continues to suffer extreme mental anguish and other injuries as a result of this incident and the deliberate indifference of Defendants which proximately caused this incident.

**B.    Kimberly Doe**

85.     Plaintiff Kimberly Doe, a 38-year-old native and citizen of Brazil, was beaten and raped repeatedly by her drug-using husband in her home country.  For many years she felt helpless to escape his abuse, as he had almost unlimited authority to act as he chose and he threatened to kill her if she left.  Furthermore, the police in Brazil had a reputation of offering no assistance whatsoever to victims of sexual assault and domestic violence.

86.     Having finally determined that it was no longer in any way possible to stay and having found a mechanism for escape in November 2008, she made every effort to reach the

United States, where she believed her husband could not find her and terrorize her. She left her three children in the custody of her mother-in-law, who feared for Kimberly's life and supported her decision to leave. Kimberly fled from Brazil to Guatemala to Mexico, but stalled out before reaching the United States border as the individual hired to assist her in transport abandoned her in Mexico. Unable to return to her home country in the face of her husband's abuse and death threats, she returned to Guatemala until she could make another desperate, and this time successful, attempt to reach the United States in March 2010. Given the democratic traditions of the United States and the prospect of safety from her husband, she placed all her hopes in securing asylum in this country. Those hopes received a significant boost when an asylum officer interviewed her and found prima facie evidence in support of her claim, allowing her to be released from the Hutto detention facility on April 15, 2010.

87.     The relief and anticipation that Kimberly felt upon her release from Hutto turned to fear when she realized that only one officer, a male, would transport her to the Airport at 4:35 a.m. She had expected that a female officer would transport her and became anxious and uncomfortable when she realized that Defendant Dunn alone would drive her to the Airport.

88.     When Defendant Dunn stopped unexpectedly at the Conoco Station after driving only a short while and demanded that Kimberly get out of the van and put her arms up, she knew something was terribly wrong. Defendant Dunn groped her for an extended period of time, lifting her blouse and underwire bra and fondling her breasts and then touching her all over the rest of her body, including her crotch area and buttocks.

89.     Defendant Dunn then demanded that she re-enter the van, this time in the front seat. He began driving again, but at the same time he was fondling himself and trying to touch Kimberly. She was crying throughout.

90.     When Defendant Dunn made a second stop, simply pulling some distance off the road, and began assaulting her again, Kimberly feared the worst.  He continued to fondle himself and to touch her.  She clung to the car door and turned away from him in a desperate effort to buy time, believing that he would rape her, if she did not manage at a minimum to delay him. Having come from a situation involving repeated rapes and physical abuse at the hands of her husband and thus well aware of the violence of sexual predators, she believed that she would ultimately fail in her efforts and that Dunn would rape and kill her.

91.     Even after Dunn started the van back up again and dropped Kimberly off at the Airport, she felt horribly afraid and depressed.  The security and protection from abuse and assault she had hoped to find in the United States had failed to materialize.  Her self-esteem crumbled, and she despaired that she would find the sanctuary she hoped in the United States. She was and remains to this day deeply afraid that Defendant Donald Dunn will find her and retaliate against her for acknowledging he assaulted her.  She had received no information while in detention at the Hutto facility on her rights and remedies with respect to sexual assault and, in any event, felt so unsafe, terrified, and depressed that she did not report the incident.

92.     Kimberly suffered and continues to suffer extreme mental anguish and other injuries as a result of this incident and the deliberate indifference of Defendants which proximately caused this incident.

## C.    Raquel Doe

93.     Plaintiff Raquel Doe, a 35-year-old native and citizen of Guatemala, was threatened on multiple occasions by the murderers of her common-law husband.  Convinced that the murderers would likely act on their threats to harm her and her four children, and seeking to put as much distance between them and herself as she could manage, Raquel set out for the

United States in February 2010.  After crossing the border and walking five days through the desert, carried at times by two of her companions because of her extreme exhaustion, she made no effort to escape when U.S. federal immigration officers came to detain her.  Unable to return to her home country in the face of the threats of her common law husband's murderers, she placed all her hopes in God.

94.     Her hopes sank as she faced filthy, disgusting, and degrading conditions in holding cells in Texas.  As but one example, for a stretch of several days, Raquel remained covered in her own menstrual blood while housed in close quarters with many other detainees in the cells, bused in shackles to different locations, and then herded into yet other cells because she was not given an opportunity to wash or even to change clothes, and she was denied access to sanitary napkins.  By the time she reached the Hutto facility, therefore, Raquel was degraded, exhausted, and despairing.

95.     Nevertheless, when an asylum officer interviewed her and found prima facie evidence in support of her claim, allowing her to be released from the Hutto facility on May 6, 2010, Raquel was relieved that, at least in the short term, she would not have to worry about returning to the country in which she would have to endure threats from her husband's murderers.

96.     When an ICE officer took her to the van where Defendant Dunn waited to transport her to the Airport that morning, Raquel immediately noticed there was only one male escort driver and thought it quite odd.  As she entered the prison-like back of the van, she prayed to God to help her, and, as they drove, she recited the rosary to herself.  When Dunn turned off the road and stopped about half an hour into the trip and demanded that she exit the van, Raquel believed that her worst fears were coming to pass.

97.     Dunn demanded that Raquel put her arms up and he began pulling her clothes up and groping all over her.  He pulled up her blouse and fondled her breasts.  He plunged his hands into her clothes and fondled her buttocks and vaginal area.  At the same time, he fondled himself.

98.     He then demanded that she get back in the front area of the van.  He first hurriedly shoved anything that was on the floor of the front area of the van.  He then motioned for her to lie down on her back.  She refused.  Subsequently, he demanded that she get in the back part of the van and he followed her.  He began pulling off his clothes, unzipping his pants and exposing his genitalia.  He demanded that she remove her own clothing, but she refused.  With his genitals in his hand, he began pulling off her pants himself.  She cried and resisted.  He became fiercely angry, but ultimately put his own clothes back in place and went back to the front of the van to resume the trip.  Throughout the entire incident, Raquel believed that Dunn would rape and kill her.

99.     As soon as Defendant Dunn unlocked the vehicle and opened the cage at the Airport, Raquel burst out of the vehicle and immediately began running.  She fled into the Airport, where an employee noticed her tears and asked her what was wrong.  That employee found a Spanish speaker to speak with Raquel and to discover the source of her obvious distress.

100.    Raquel suffered and continues to suffer extreme mental anguish and other injuries as a result of this incident and the deliberate indifference of Defendants which proximately caused this incident.

**D.    Anna Roe**

101.    Plaintiff Anna Roe, a 26-year-old native and citizen of El Salvador, suffered through repeated beatings and pervasive abuse at the hands of the hard-drinking father of her daughter—violence which began during her pregnancy.  He threatened her with worse, if she

ever tried to leave.  Nevertheless, as the violence escalated, Anna summoned up the courage to act.

102.    She made her way slowly to the United States, working in Guatemala washing dishes for a few weeks and then working in a market in Mexico for three months.  When she could finally manage it, she entrusted her safety to a human smuggler, hoping desperately to leave violence and extreme hardship behind her and to provide for her young children who remained in El Salvador with her mother.

103.    Taking sick during the border crossing at night, however, she found out quickly that she had misplaced her trust.  After taking her to a car on the United States side of the border, the smuggler and the others with her drove for ten minutes and then pushed her out onto the side of the road, where she lay helplessly until the sun came up.  Then, she painfully dragged herself to a house, begged for help, and fainted.  She woke up chained and terrified in a vehicle of federal immigration officials.

104.    After spending time in various holding cells and similar facilities, Anna finally found herself in the Hutto facility, where she spent about two months.  Delighted to discover she could bond out after a credible fear interview gave her the opportunity to explain the abuse she had suffered to relevant officials, Anna hoped to leave her terrors once and for all in the past. She left Hutto at approximately 4:56 a.m. on December 18, 2009, locked with another female detainee (Georgina Roe) in the back of a transport van driven by Defendant Donald Dunn.

105.    Defendant Dunn stopped the van after about 15 minutes of driving at the Conoco Station and insisted that Anna and her companion exit the van.  Anna thought this demand very strange, given the darkness of the hour and the fact that Dunn had parked the van in a hidden corner of the gas station lot.  Dunn told Anna and her companion to raise their arms up and he

began to touch them, lifting their shirts, putting his hands inside their clothes, and fondling their private parts.  When Anna tried to pull her shirt back down, Defendant Dunn grabbed her arms and forced them back up.  Dunn screamed at them both in English.  Anna was terrified that Dunn would rape her and her companion.  Dunn groped Anna and her companion for an extended period of time.

106.    Finally, Defendant Dunn had his victims get back in the van and drove them to the Bus Station.  With the help of an attorney, Anna made her way to the Airport and left the area.  So frightened was she that Anna did not report the incident to any authorities.

107.    Anna suffered and continues to suffer extreme mental anguish and other injuries as a result of this incident and the deliberate indifference of Defendants which proximately caused this incident.

**E.    Georgina Roe**

108.    Plaintiff Georgina Roe, a 31-year-old native and citizen of Honduras, experienced rampant physical and sexual abuse at the hands of her alcoholic and drug-addicted ex-life partner in her home country.  On one occasion, he tried to direct his violence towards Georgina's young son.  She prevented this and received a terrible beating for her efforts that required medical attention.  When she went back to stay with her family to escape this brutality, he threatened to kill her and her family and sent hooded goons to rough them up.  Consequently, as soon as Georgina had recovered sufficiently to manage the journey, she left for the United States to leave this nightmare behind.

109.    Having made her way through Guatemala and Mexico, Georgina crossed over into the United States seeking asylum.  She walked for a few hours, but she was soon apprehended by federal immigration officers.  After a month or so at the Pearsall detention

center, authorities transferred Georgina to the Hutto facility.  After about a month and a half

there, Georgina bonded out of that facility on the basis of a credible fear interview.  She felt her

nightmares could finally end.

110.    When she left the Hutto facility at 4:56 a.m. on December 18, 2009, she thought it

highly strange and disconcerting that only one male driver would take both her and Plaintiff

Anna Roe to the Bus Station without any female escort officer present.  After Defendant Dunn

drove them for some time, he stopped at the Conoco Station in a hidden spot and demanded that

Georgina and Anna get out of the van.  Dunn pretended to engage in a search, but touched over

their whole bodies, including fondling their buttocks and breasts.  He screamed at them as well.

Georgina felt humiliated and terrified at this treatment, which lasted at least ten minutes or so.

111.    Finally, Defendant Dunn had Georgina and Anna get back in the van and drove

them to the Bus Station.  Georgina left Texas and went elsewhere in the country.  So frightened

was she that Georgina did not report the incident to any authorities.

112.    Georgina suffered and continues to suffer extreme mental anguish and other

injuries as a result of this incident and the deliberate indifference of Defendants which

proximately caused this incident.

## F.    Emily Roe

113.    Plaintiff Emily Roe, a 29-year-old native and citizen of El Salvador, was the

victim of pervasive physical and sexual attacks in her home country at the hands of the father of

her children.  After many years of suffering through this constant violence, Emily determined

that she had to leave once and for all.

114.    She traveled through Guatemala and Mexico and crossed the border into the

United States, where federal immigration officers were waiting.  Although most of her group

attempted to flee, Emily did not.  She sat there crying, hoping desperately that she would not be sent back to the life of violent abuse she had known before.  After stops at various other detention facilities, Emily found herself at the Hutto facility, where she remained for a month and a half.  When federal officials conducted a credible fear interview with her and allowed her to bond out, Emily felt her life had taken a turn for the better.

115.     She left Hutto at 5:36 a.m. on the morning of March 20, 2010, to go to the Airport.  Defendant Donald Dunn, having just returned from a venture to the Airport earlier that morning during which he sexually assaulted Plaintiff Sarah Doe, locked Emily in the back seat of his van and took off.  Surprised and disturbed to find herself alone in the van with Defendant Dunn, Emily was terrified when Dunn took her directly to a house in a residential neighborhood.

116.     Defendant Dunn brought Emily into the house with him, where he proceeded to touch all over her legs, buttocks, and breasts.  He kept her in the house for about fifteen or twenty minutes, during which she felt tremendous anxiety and discomfort.  She was terrified that Dunn would go further than he had already gone, particularly as he looked at her again and again in a menacing manner.  Finally, Dunn brought Emily out of the house and back to the van and drove her quickly to the Airport.

117.     Emily caught her flight and went elsewhere in the country.  She was so frightened that she did not report Dunn's assault to the authorities.  She feels like bursting into tears every time she even thinks at all about what happened.

118.     Emily suffered and continues to suffer extreme mental anguish and other injuries as a result of this incident and the deliberate indifference of Defendants which proximately caused this incident.

**G.     Beth Roe**

119.     Plaintiff Beth Roe, a 32-year-old native and citizen of Honduras, grew up in extreme poverty and other hardships in her home country.  When she left Honduras in an attempt to escape those hardships, she was raped by the human smuggler to whom she had entrusted her safety and welfare.

120.     When she finally entered the United States, federal immigration officials caught her and detained her in one facility after another, finally transporting her to Hutto.  After a credible fear interview, Beth managed to bond out of the Hutto facility and she left on the morning of April 24, 2010.

121.     When she left the Hutto facility at approximately 3:24 a.m., Beth was surprised to find herself locked in the back of a van with two other women with only Defendant Donald Dunn escorting them.  Other officers inside the facility could see that they were alone in the van with Defendant Dunn as they had a clear view of the van as it left.  However, the other officers did nothing to stop the transport.

122.     Beth's surprise turned into increased doubt as she heard Dunn speak angrily into his telephone as they drove.  The doubt turned to terror when Dunn stopped at the Conoco Station shortly after departing.  He forced the women to leave the vehicle.  He then stood them in a row and began touching them all over their bodies.  Beth feared that he would kill or violate them.

123.     Dunn eventually let his victims back in the van and drove them to the Airport. There, before he let them leave, he asked each of them for money for the ride.  None of the women had any money, and they feared that he would not let them go.  Ultimately, however, Beth went into the Airport and caught her flight.

124.    A few days after she reached her destination, Beth called the Hutto facility on the telephone to report what Donald Dunn had done.  She spoke on the telephone with a female employee at Hutto who promised to relay the information to the necessary authorities.  Beth reported the incident well before Dunn's assault on Plaintiff Raquel Doe.

125.    Beth suffered and continues to suffer extreme mental anguish and other injuries as a result of this incident and the deliberate indifference of Defendants which proximately caused this incident.

## H.    Constance Roe

126.    Constance Roe, a 35-year-old native and citizen of Brazil, suffered constant physical abuse at the hands of her common-law husband in her home country.  When she left him and moved back in with her parents, he begged her to come back and promised he would change.  He did not.  When she left again, he followed her and threatened to kill her.  In desperation, she came to the United States.  He pursued her even there, but never found her.

127.    While in the United States, Constance remarried.  Her new husband assaulted her as well, however, and subjected her to rampant psychological abuse and humiliation.  After he forced her to have an unwanted abortion, she finally divorced him.  She was deported soon thereafter, but she returned to the United States, both to ensure her safety from her first husband and to raise her son, who had remained in the United States.  She was seized by federal immigration officials upon reentry and detained at Hutto.  After her credible fear interview, federal officials permitted Constance to bond out of that facility.

128.    When she left the Hutto facility at around 3:24 a.m. on the morning of April 24, 2010, Constance looked forward to rejoining her son and making her way forward to a better life.  Although she and Beth Roe and the other woman they were with (Faith Roe) in the back of

Defendant Donald Dunn's van thought it was odd that only one male officer would transport them to the Airport, they all thought that Dunn's status as an authority would prevent him from harming them.  They were wrong.

129.     Defendant Dunn stopped at the Conoco Station and demanded that Constance and her two companions exit the vehicle.  He made them lift their arms in the air as though were going to begin a search.  As he touched Beth Roe and Faith Roe all over their bodies, Constance waited for her turn with ever-increasing fear and anxiety.  Remembering the cell phone she carried, she warned Dunn in halting English that she would call her friend if he tried to grope her in the same way as the others.  He nevertheless groped her arm area and waist before allowing the women to reenter the vehicle.  In terror, Constance wondered whether Dunn would take them to yet another hidden location to have his way with them.  He took them to the Airport instead. There, he asked them each individually for money for the ride.  When it turned out that they did not have any, he let them go.

130.     Constance caught her flight and went elsewhere in the country.  She was so frightened that she did not report Dunn's assault to the authorities.  Her fears continue to this day.

131.     Constance suffered and continues to suffer extreme mental anguish and other injuries as a result of this incident and the deliberate indifference of Defendants which proximately caused this incident.

## VI.  Sexual Assaults Were Committed by Defendant Dunn or Other Male Transport Officers on Other Female Detainees.

132.     Defendant Dunn's sexual assaults on the eight named Plaintiffs were by no means isolated incidents.  On the contrary, as detailed more fully below, Defendant Dunn is known to have assaulted at least two other female immigrant detainees besides the named Plaintiffs.  He

was stopped only because Plaintiff Raquel Doe reported what had happened to her and local police began an investigation following the attack on Raquel.

### A.   Assaults Charged by the State of Texas, Williamson County

133.   On August 19, 2010, the Williamson County Sheriff's Department arrested Defendant Dunn and charged him with three counts of official oppression and two counts of unlawful restraint for attacks Dunn had committed within the borders of Williamson County itself.  One count of official oppression was predicated on Dunn's assault on Ms. Kimberly Doe. Another was predicated on his assault on Ms. Sarah Doe.  The other count of official oppression was predicated on Dunn's assault on Ms. Anna Roe.  Defendant Dunn was charged with unlawful restraint in connection with his assaults on Ms. Beth Roe, and Ms. Constance Roe.

134.   During the course of the Williamson County investigations into his conduct, Defendant Dunn admitted that his conduct was designed only for his own self-gratification and not for any legitimate purpose.

135.   On November 9, 2010, Defendant Dunn pleaded guilty to the Williamson County charges and was sentenced to one year in jail, along with a period of probation.

### B.   Additional Assaults Charged By the United States

136.   On March 24, 2011, the federal government filed a Criminal Information in the Western District of Texas, Austin Division, against Dunn, predicated on four sexual assaults on women beyond those described in the Williamson County case.  The federal government charged Dunn with four counts of deprivation of civil rights under color of law without due process of law.  One of the four victims was Ms. Raquel Doe.  Another was Ms. Emily Roe.  The two other women referenced in the Criminal Information were not referenced in the Williamson County case and are not named Plaintiffs in this lawsuit.

### i. Victim Dora Roe

137.     On December 24, 2009, according to this Criminal Information, Defendant Dunn

sexually assaulted Ms. Dora Roe, a female immigrant detainee at Hutto, touching her breasts in a

sexual manner.  On information and belief, Dunn was transporting Ms. Dora Roe to the Airport.

On information and belief, one other female detainee accompanied them during this transport.

On information and belief, the transport began at 4:56 a.m.

### ii. Victim Faith Roe

138.     On April 24, 2010, according to this Criminal Information, Defendant Dunn

sexually assaulted Ms. Faith Roe, touching her breasts and buttocks in a sexual manner.  On

information and belief, Dunn assaulted Faith Roe during the same transport in which he

assaulted Ms. Beth Roe and Ms. Constance Roe as detailed above.

139.     On September 7, 2011, Dunn pleaded guilty to two out of the four federal charges

and was sentenced in November 2011.  Among other things, Dunn expressly agreed that the

government's evidence would prove beyond a reasonable doubt that he had engaged in criminal

conduct with respect to Ms. Raquel Doe as well as Ms. Emily Roe, Ms. Dora Roe, and Ms. Faith

Roe.

### C.     Numerous Potential Additional Victims of Donald Dunn

140.     Defendant Dunn transported many female immigrant detainees besides the eight

named Plaintiffs and the other two women referenced above either to the Airport or to the Bus

Station during the course of his employment at Hutto.  On many occasions, he transported these

women between midnight and 6 a.m.  Given Defendant Dunn's behavior patterns established by

the facts as recounted above and by his own admissions, it is likely that he assaulted other

women as well in the same or similar fashion.  Indeed, Defendant Dunn admitted to Williamson County authorities that he had committed such violations against "numerous" female detainees.

### D.    Numerous Additional Potential Victims of Other Escort Drivers

141.    As detailed above, many other male officers transported female detainees from Hutto without any other escorting officer at all, much less a female officer.  Many of these transports occurred under circumstances almost identical to those in which Defendant Dunn transported his victims in that they occurred in the early hours of the morning using a desolate and dimly lit route with every opportunity for the officer to exercise his almost unlimited control over the situation at his discretion.  The history of rampant sexual assault at ICE immigrant detention centers, combined with the apparent laxity pervading the transport process at Hutto and the utter failure of CCA, Williamson County, or ICE officials to rectify or even notice repeat violations of the contract prohibition on opposite-sex solo transport, strongly supports the inference that other officers responded just as Dunn did to the almost unlimited authority conferred on them in these situations.  Both Kimberly and Raquel recall that Defendant Dunn, during their respective sexual assaults, spoke to unidentified callers on his cell phone in a leering manner that suggested he was talking about them and his assaults on them.  On information and belief, Dunn was describing his activities during his calls and may have been speaking to colleagues at Hutto who may have conspired to commit similar acts.  Taking these considerations together, it is likely that other male officers working at Hutto assaulted female detainees sexually during transport during the Class Period.

## VII.   ICE's Failure To Remedy Continued Risk of Sexual Assault at Hutto Generally, and Plaintiffs' Vulnerability to Deportation Specifically, Compounded Plaintiffs' Difficulty in Seeking or Obtaining Remedies for their Assaults.

142.    The named plaintiffs assaulted by Defendant Dunn faced particular and unique difficulties in reporting their assaults or seeking remedies.  In fact, their experiences as immigrants presented them with difficulties of this kind from the start.  As the National Prison Rape Elimination Commission found in a June 2009 report,

> [t]hose who have already suffered terrifying experiences in their home countries or in the United States can be almost defenseless by the time they are detained and may even expect to be abused.  . . . [Furthermore,] [s]exual abuse victims may be perceived as disgracing the family and even be at risk for retaliation by their own family members. This added danger, coupled with unfamiliarity with the processes of reporting or even with the right to report, makes it even less likely that immigration detainees will disclose sexual abuse experiences.[23]

143.    Moreover, because Dunn assaulted them while conveying them to catch either an airplane or a bus that would carry them out of the local area, his victims could not easily report the situation to anyone in the locale in which the events occurred.

144.    Even after escaping Donald Dunn, each woman faced the continued challenge of obtaining status in the United States, compounded by the fear that Donald Dunn could negatively affect her immigration cases if he so desired.  Having failed to protect these women from sexual assault, ICE officials owed these women a duty to assist them in taking the necessary steps to seek some sort of remedy.

145.    However, despite extraordinary advocacy efforts that ensured direct knowledge of the situation not only in ICE's local field office but in its national headquarters, and despite ICE's own statements that it would take significant remedial steps, ICE officials shrugged off their responsibilities to the sexual assault victims.  Even after garnering testimony from these women that was critical to the criminal case against Defendant Dunn, ICE officials failed to notify the victims that Dunn was ultimately arrested, failed to inform them that many of their names had been improperly disclosed, and failed to provide them with requisite notice as to their

---

[23] National Prison Rape Elimination Commission Report, June 2009, pp. 22, 180.

right to apply for a U Visa as they unquestionably had the obligation to do, particularly when the criminal activity giving rise to the U Visa option occurred while the victims were in ICE custody and arose as a result of the deliberate indifference of relevant ICE officials. In fact, rather than supplying the victims with the requisite information on U Visas, in several cases, ICE moved forward with deportation proceedings.

146. On information and belief, Defendant Joe Benavides determined not to provide assistance or even effective notice of available options to these women in full knowledge of the risks and hardships to these women such a determination would pose.

A. **Despite Its Public Statements and Despite the Efforts of Advocates, ICE Refused To Provide Adequate Information and Assistance to Dunn's Victims**

147. ICE issued a number of public statements asserting its commitment to bringing the perpetrator of the assaults to justice and addressing the failure of its contractor, CCA, to prevent the assaults. On May 28, 2010, ICE announced the commencement of a criminal investigation into allegations of sexual assault of female immigrant detainees by a contract guard at the T. Don Hutto facility. Among other things, the statement included the following:

- ICE has directed CCA to implement a variety of reforms immediately. Failure to complete these reforms, or any further violations of ICE policy, may result in the termination of this and every CCA contract with ICE.

- ICE is pursuing all contract remedies against CCA including the full costs of the contract guard and financial penalties for failure to maintain workforce integrity.

- ICE is placing CCA on probation.

- ICE implemented mandatory sexual harassment training for all facility staff.

- CCA must increase the frequency of Prison Rape Elimination Act of 2003 (PREA) training to four times per year for employees at each facility housing ICE detainees. CCA must also allow ICE to select a CCA-funded independent party to verify that Hutto and all other facilities housing ICE detainees are PREA-compliant.

- CCA must ensure that ICE's policy that female detainees not be isolated with male official [sic] is enforced in all CCA facilities holding ICE detainees—without exception.

- CCA must increase availability of legal resources to detainees.

148.    Also on May 28, 2010, DHS Contracting Officer David Sanders sent a letter to the CCA Executive Vice President and Chief Development Officer stating that DHS had been advised that a CCA employee had sexually assaulted female detainees at the T. Don Hutto Detention Facility.  The letter indicated that CCA was being placed on "probation" for failure to follow ICE mandated transport policies and procedures.

149.    "Probation" is not a status that exists under the Federal Acquisition Regulation. On information and belief, CCA was never placed on "probation."

150.    The same day, Phyllis Coven, Acting Director of ICE's Office of Detention Policy and Planning, contacted immigration advocates in Washington, D.C., and Texas to inform them that a CCA employee had sexually assaulted female detainees at the T. Don Hutto Detention Center.  Advocates from a number of non-profit organizations that work with immigrants, including the American Immigration Lawyers' Association ("AILA"), the ACLU, and the Women's Commission on Refugee Women and Children, had two immediate concerns: (1) ensuring that the victims had information about social services, immigration assistance, and U Visas, and (2) ensuring the prevention of further sexual assault at Hutto.

151.    U Nonimmigrant status, commonly referred to as a "U Visa," offers immigration protection for victims of crimes and serves as a tool for law enforcement to investigate and prosecute crimes.  U Visas are available to immigrants who meet the following four criteria:

- The immigrant was the victim of a qualifying criminal activity and suffered a substantial physical or mental abuse as a result of the crime;

- The immigrant possesses credible and reliable information about the qualifying criminal activity;

- The immigrant is, has been, or is likely to be helpful to the investigation and/or prosecution of that qualifying criminal activity; and,

- The immigrant is a victim of a criminal activity that violated U.S. law.

8 U.S.C. § 1101 (a)(15)(u).  False imprisonment, sexual assault, torture, rape, and other related crimes are considered "qualifying criminal activities" for purposes of a U Visa.  8 U.S.C. § 1101 (a)(15)(u)(iii).

152.    Obtaining a U Visa is a two-step process.  First, the immigrant must obtain a "law enforcement certification" ("LEC," also known as a Form I-918, supplement B) stating that: 1) the person signing the certificate is the head of the certifying agency, or any person(s) in a supervisory role who has been specifically designated by the head of the certifying agency to issue U nonimmigrant status certifications on behalf of that agency, or is a Federal, State, or local judge; 2) the agency is a Federal, State, or local law enforcement agency, or prosecutor, judge or other authority, that has responsibility for the detection, investigation, prosecution, conviction, or sentencing of qualifying criminal activity; 3) the applicant has been a victim of qualifying criminal activity that the certifying official's agency is investigating or prosecuting; 4) the petitioner possesses information concerning the qualifying criminal activity of which he or she has been a victim; 5) the petitioner has been, is being, or is likely to be helpful to an investigation or prosecution of that qualifying criminal activity; and 6) the qualifying criminal activity violated U.S. law, or occurred in the United States, its territories, its possessions, Indian country, or at military installations abroad.  Second, within six months of the date of the LEC, the immigrant must submit a complete application, containing the LEC and a number of

supporting documents, to United States Citizenship and Immigration Services ("USCIS") for processing.

153. Advocates promptly began working to compose an information and referral sheet ("Immigration and Social Services Referral Sheet") on the U Visa and other topics to distribute to victims. The Immigration and Social Services Referral Sheet contained information about how to obtain legal and social services and included contact information for American Gateways and the University of Texas School of Law Immigration Clinic, two non-profit organizations serving immigrants in the Central Texas area where Hutto is located.

154. At the same time, advocates in Texas drafted a second information sheet ("Sexual Assault Information Sheet") to be distributed and posted at Hutto, stating that detainees have the right to be free from sexual assault and advising detainees who had experienced or were aware of sexual assault to report the abuse without fear of retaliation by ICE or CCA. The intent of the Sexual Assault Information Sheet was to ensure women detained then or in the future at Hutto knew that they had the right to be free from sexual abuse in immigration detention and to encourage women to report abuse going forward without fear of retaliation. On June 2, 2010, advocates were told that ICE was reviewing the Sexual Assault Information Sheet and that it would be approved for distribution at Hutto shortly. On June 3, 2010, advocates in Texas were told that the Sexual Assault Information Sheet would not be approved for distribution because it was too broad, did not precisely track the language of federal or state statutes, and could create confusion for detainees.

155. On June 4, 2010, immigration advocates contacted ICE officials at the DHS's Office of Professional Responsibility ("OPR"), who referred the advocates to another official within ICE. The following week, an advocate spoke with an ICE official about the Immigration

and Social Services Referral Sheet for Victims and the possibility of a disclosure authorization

form which women assaulted by Dunn could sign to authorize the release of their contact

information to advocates who could provide access to pro bono immigration counsel and U Visa

assistance, and the geographic locations of the women identified as potential victims.  That

official said that the Williamson County Sheriff's Office and OPR did not foresee any problem

with providing the Immigration and Social Services Referral Sheet for Victims to the women

Dunn allegedly assaulted.

156.    In early June, an internal ICE memo detailing changes at CCA managed detention

facilities was leaked to the press.  The memo indicated that CCA was implementing a number of

changes at its detention facilities across the country, designed to make facilities more "humane."

One of the changes described in the memo was a shift to reduce and eliminate pat-down

searches. [24]

157.    On June 14, 2010, an advocate spoke again with the ICE official, who asked that

she send him the Immigration and Social Services Referral Sheet for Victims so that he could

submit it for an opinion from the ICE Office of Principal Legal Advisor ("OPLA").  The

advocate emailed him the information sheet, which he forwarded to OPLA.  The following day,

the ICE official emailed the advocate to indicate that OPLA's initial take on the Immigration and

Social Services Referral Sheet for Victims was not positive and to suggest that advocacy groups

prepare a more general sheet with references to services available to victims of sexual assault

and immigration assistance.

158.    Later that same day, the ICE official informed advocates that OPLA had advised

OPR not to have investigators distribute the Immigration and Social Services Referral Sheet for

---

[24]    Susan Carroll, *Coming for Some at ICE Jails: Bingo and a Continental Breakfast*, The Houston Chronicle, June
8, 2010.

Victims to the women, but that some women would be given the EOIR list of free or reduced fee legal service providers and/or the ICE victim assistance pamphlet, and that some women would be told about the U Visa.  A revised version of the information sheet did not appear to be an option.

159.    On June 29, 2010, eleven advocacy organizations, including AILA, the ACLU, Human Rights Watch, Just Detention International, the National Immigrant Justice Center, and Physicians For Human Rights, U.S.A. submitted a letter to Janet Napolitano, Director of the Department of Homeland Security, identifying serious concerns with ICE's detention policies and practices and specific concerns regarding sexual abuse in ICE facilities.  Noting that numerous assaults had been previously reported at other facilities including Hutto; that the Hutto sexual assaults took place at a facility ICE itself had touted as a model; and that Hutto had an on-site ICE Detention Services Manager specifically charged with ensuring ICE standards were followed, the letter concluded that ICE was incapable of policing itself or its contractors despite the much-touted reforms announced in the fall of 2009 and urged DHS to establish independent external oversight of ICE's detention system.  Finally, the letter urged DHS to promulgate legally binding regulations governing ICE's treatment of the over 440,000 immigrants it detains every year.

160.    On June 30, 2010, advocates again raised the issue of providing the Immigration and Social Services Referral Sheet for Victims to Hutto survivors at a meeting with representatives of the Department of Homeland Security ("DHS") Office for Civil Rights and Civil Liberties ("OCRCL").  The advocates were told that ICE could not provide the information sheet to the women.  ICE offered: (1) to provide ICE's list of legal and social service providers

to the women whom ICE had identified as victims, and (2) to provide, as a separate addendum to the list, contact information for American Gateways and the UT Immigration Clinic.

161.    In early August 2010, a DHS representative emailed an advocate to inform her that OPR had identified ten women as victims and that those women were located in or near cities in the Mid-Atlantic region of the United States and in the Southeastern United States. Shortly thereafter, advocates from a number of nonprofit immigrants' rights organizations conducted outreach seeking to notify known or potential victims of Donald Dunn of their right to seek U nonimmigrant status.  Advocates conducted outreach via several non-profit listservs that serve the immigrant advocacy community and also reached out to a number of the social service agencies to which ICE had reportedly referred women to request they also provide immigration information to any Hutto survivors they encountered.  These outreach efforts were unavailing.

## B.   Defendants Failed To Notify Victims of Dunn's Arrest or of the Release of Their Names

162.    The day after Dunn's arrest in August 2010, without notice to the survivors of the assaults, their attorneys, or advocates, the Williamson County Sheriff's Department and ICE held a press conference to discuss the investigation and Dunn's arrest.

163.    During the press conference, the officials made public the names of five of the women who had been assaulted in Williamson County and a sixth woman who had reported her assault, triggering the investigation.  Williamson County and ICE officials released this information despite the fact that generally accepted law enforcement best practices discourage the public naming of victims of sexual assault to protect the privacy of the victims, and with the knowledge that the named plaintiffs were seeking asylum due to fear of persecution up to and including death in their home countries.  They also noted that Dunn allegedly assaulted several other women in Travis County and indicated those assaults could result in subsequent charges.

164.    On August 24, 2010, on information and belief, ICE moved to administratively close the immigration cases of seven of Donald Dunn's identified victims.  Administrative closure indicates that ICE is not actively pursuing immigration charges against an individual, but the immigration case can be re-opened by either party for adjudication at any time.  On information and belief, none of the women knew or were told their cases were going to be administratively closed.  Six of the cases were administratively closed.

165.    On September 8, 2010, Defendant Dunn pleaded guilty to all five charges.

**C.   Defendants Failed To Advise Victims of the Availability of U Nonimmigrant Status and Relief From Deportation and Failed Promptly To Certify U Visa Applications**

166.    On information and belief, the named plaintiffs were candidates for U Visas based on their sexual assaults by Donald Dunn and the information they subsequently provided to law enforcement about their assaults.  Despite the state and subsequent federal prosecution of Donald Dunn for sexually assaulting these women, and despite the best efforts of advocates to ensure the victims of Donald Dunn were advised of resources, including pro bono immigration assistance that could have advised them of and helped them apply for U Visas, only one of the named plaintiffs has obtained a U Visa as of the date of the filing of this Complaint.  On information and belief, none of the known victims of Dunn's assaults who are not named plaintiffs in this Complaint has obtained a U Visa or other immigration status in the United States.

**i.  Kimberly Doe**

167.    Kimberly Doe did not report her assault by Donald Dunn to anyone, including the immigration attorney she retained upon her release from Hutto.  She did not report the assault because she was ashamed and because she feared retaliation by Donald Dunn and/or federal immigration officials.

168.     Kimberly's attorney became aware of the assault only after investigators interviewed her client about what happened to her as she was being transported out of detention following Raquel's outcry months later.  The interview occurred on June 10, 2010.  On information and belief, John Foster, the Williamson County Contract Monitor, conducted the interview along with Defendant Joe Benavides, an ICE official.  On information and belief, after interviewing Kimberly, these individuals advised her that Defendant Dunn had admitted to assaulting her and other women.  Kimberly's attorney immediately requested that the investigators handling the criminal investigation into the Hutto assaults provide the certification necessary for Kimberly to apply for a U Visa, and she provided the appropriate form to them via email on June 11, 2011.

169.     Despite repeated assurances that they would do so, both at the time Kimberly was interviewed and during multiple phone calls thereafter, neither Williamson County nor ICE officials provided the U Visa certification required for Kimberly to apply for an adjustment of status.  In anticipation of an August 18, 2010, hearing in Kimberly's immigration case, her attorney, having failed despite her best efforts to procure the U Visa certification from John Foster and despite his assurances he would provide the certification, began reaching out to immigration advocates in Texas to see if anyone could assist her in approaching Mr. Foster to obtain the U Visa certification.  On August 9, 2010, Kimberly's attorney also emailed an official in ICE's Office of Policy to request his assistance in obtaining the U Visa certification for Kimberly.  Despite her persistent efforts, the certification was not forthcoming.

170.     Just after Donald Dunn was arrested in August 2010, Williamson County and ICE held a press conference to announce the arrest.  At this press conference, they made an Affidavit bearing Kimberly's name available to the press and other attendees.

171.     Throughout this time, Kimberly's immigration attorney repeatedly contacted John Foster by telephone, email, and U.S. mail asking that he provide the signed U Visa certification as promised.  Despite repeated assurances, Mr. Foster failed to provide the certification.  On October 18, 2011, Kimberly's attorney sent letters requesting U Visa certification to Williamson County Assistant County Attorney Heather Trice, who on information and belief was the prosecuting attorney responsible for the state charges that had been brought against Dunn; Williamson County Judge Tim Wright, who on information and belief presides over the Williamson County court in which those charges were filed; ICE deportation office supervisor, Carl Stephens, who on information and belief was stationed at Hutto during the relevant time period; and ICE Field Office Director Michael Pitts, who on information and belief was in charge of ICE's San Antonio Regional Field Office which has jurisdiction over the Hutto facility.  She received no response.

172.     During the entire period that Defendant Dunn's state criminal case progressed, with Dunn pleading guilty in September 2010 and receiving his sentence that November, Kimberly's immigration attorney continued to seek U Visa certification.

173.     On Saturday, December 4, 2010—nearly six months after her client provided testimony material to Donald Dunn's arrest and ultimate conviction, and only after repeated entreaties by her to multiple officials with Williamson County and ICE—Kimberly's attorney received the U Visa certification.

174.     On December 17, 2010, Kimberly's attorney submitted her application for a U Visa to USCIS.

175.     It was not until September 13, 2011, that Kimberly finally received a U Visa.

**ii.  Sarah Doe**

176.     Sarah Doe did not report her assault by Donald Dunn after her release from Hutto to her family or to any officials.  She did not report the assault because she was ashamed and because she feared retaliation by Donald Dunn and/or federal immigration officials.

177.     Williamson County and ICE officials showed up at Sarah's home unannounced several months after Sarah had been released from Hutto.  On information and belief, these officials were John Foster and ICE officer Joe Benavides.  The officials did not bring a translator and neither spoke Sarah's native language of Tigrinya.  After trying unsuccessfully to communicate with the officials, Sarah called a family member on the telephone to translate.  The family member did not feel competent to translate and asked another individual nearby, a complete stranger to Sarah, to aid in the translation.

178.     Sarah answered the officials' questions with the help of this volunteer translator. Sarah was asked to and did disclose details about her assault by Donald Dunn.  Sarah was acutely uncomfortable throughout the process because she was recounting personal details about her experience of assault to officials without understanding the purpose of their requests for information, using a stranger in her community to translate over the phone.

179.     Sarah was never advised of the availability of a U Visa, nor was she provided with resources to help her recover from sexual assault.

180.     Sarah had retained new immigration counsel upon her reaching her family in April 2010.  In July 2010, Sarah's new immigration attorney moved to transfer venue, substitute counsel, and file written pleadings.  The filing was rejected because Sarah's prior immigration attorney had not withdrawn as counsel despite Sarah's request that he do so.

181.     In October 2010, once the prior immigration attorney had finally withdrawn, Sarah's new immigration counsel moved again to substitute counsel, change venue, and file

written pleadings.  This filing was denied because, without notice to Sarah, her case had been administratively closed on September 28, 2010.

182.    Sarah's new immigration attorney contacted the court in San Antonio to find out why Sarah's case had been administratively closed.  The court would not or could not tell him why but referred him to the Office of Chief Counsel at ICE.  The Office of Chief Counsel at ICE in turn referred Sarah's immigration attorney to ICE Detention and Removal Operations in San Antonio.  A supervisor informed Sarah's attorney that his client had been involved in an incident at Hutto and that the investigation was ongoing.  Sarah's attorney immediately requested U Visa certification for his client.  He was told that the case against the perpetrator was ongoing and that ICE did not want to negatively impact the prosecution.

183.    Sarah's immigration counsel then moved to re-open her immigration case and prepared to proceed with Sarah's asylum claim while continuing to seek the U Visa certification on Sarah's behalf.

184.    Neither Sarah nor her attorney was ever advised that Donald Dunn had been arrested and prosecuted.

185.    In fact, as set forth above, Donald Dunn had been charged by Williamson County, had pleaded guilty, had been convicted and sentenced and was in jail by the time Sarah's immigration attorney found out about the assault on his client and requested U Visa certification on her behalf.

186.    Sarah's immigration attorney advised the immigration court in which Sarah's immigration case was pending that his client was the victim of sexual assault while in ICE custody and was seeking U Visa certification.  He twice delayed his client's hearings on her

asylum case in the hopes she would receive the U Visa certification, once in January 2011 and again in May of 2011.

187.    Sarah's immigration attorney also approached an Assistant Counsel in the ICE Office of Chief Counsel in Baltimore, who was responsible for prosecuting Sarah's immigration case for the government and advised that his client had provided information on a qualifying crime to law enforcement officials and would be applying for a U Visa as soon as the law enforcement entities provided U Visa certification.  The Assistant Counsel replied that it was not her responsibility to assist Sarah in this regard, nor would she undertake any action to confirm Sarah's eligibility for U Visa relief, but rather she intended to proceed with the prosecution of Sarah's case.

188.    In the meantime, unknown to Sarah and her immigration attorney, Donald Dunn had additionally been charged by the United States with four counts of violation of civil rights under color of law.

189.    As of the date of the filing of Plaintiffs' Second Amended Complaint, Sarah has still not received a U Visa.

### iii.  Ms. Raquel Doe

190.    Ms. Raquel Doe is single-handedly responsible for ending Donald Dunn's serial sexual assault and victimization of female immigrants transported from the Hutto facility.  But for her outcry that Donald Dunn had assaulted and attempted to rape her as he transported her from Hutto to the Airport on May 6, 2010, Donald Dunn would very likely have continued his activities unabated to this day.  ICE, Williamson County, and CCA had the obligation and the ability to discover and remedy the fact that male escort officers routinely transported female detainees without the presence of an accompanying female officer, including regular records of

these transports in logbooks created for, maintained at the direction of, and ostensibly monitored by each entity for the six months prior to Raquel's outcry, during which time at least 9 other women were assaulted, and the fact that ICE and CCA personnel often accompanied departing detainees to the vans in which single escort officers awaited to transport them. Nevertheless, none of these Defendants did anything about the obvious risk to the female immigrants at Hutto that these transports posed. In fact, there is absolutely no reason to think Donald Dunn and any other escort officers engaging in similar activity would have been interrupted any point thereafter by ICE, Williamson County, or CCA had Raquel not reported what happened to her.

191.    Raquel typifies the kind of individual most in need of immigration assistance. She is impoverished and, because she completed only the first grade before dropping out of school to work, cannot read or write. Widowed at age 32, she fled violence in her own country only to encounter violence in the United States, at the hands of the very government whose protection she sought. She is traumatized both by what happened to her in her home country and by what Donald Dunn did to her. She has minimal resources and contacts in the United States and a very limited understanding of the applicable law. She does not speak fluent English.

192.    Mr. Foster and Defendant Joe Benavides interviewed Raquel in detail about Donald Dunn's assault and she fully cooperated even though she feared for her safety. They provided Raquel with a list of pro bono immigration providers in her area, and she called them all. She left increasingly desperate messages as the date of her next immigration hearing approached but was unable to secure counsel.

193.    Neither Mr. Foster, nor Officer Benavides, nor any other official associated with ICE, Williamson County, or CCA ever advised Raquel of the existence of U Visas or that she might be eligible for one.

194.    Indeed, beyond providing Raquel with ICE's standard referral list of immigration attorneys, no officials did anything to assist Raquel in locating immigration counsel even after she begged for help.  In fact, Raquel regularly called Officer Benavides to request his assistance translating documents she received from immigration court because she had no other resource to help her understand what was happening in her immigration case.

195.    Even as Raquel was desperately seeking immigration counsel to assist her, advocates from a number of immigration non-profits were stepping forward and contacting ICE to offer precisely that assistance.

196.    ICE has exclusive control over information concerning the whereabouts of immigrant detainees once they are released from detention.  Only ICE officials, courts, and attorneys retained to represent a particular immigrant can access that immigrant's file.  While federal law understandably protects the names and locations of immigrants from disclosure, no law would have prevented ICE from providing direct contact information for the advocates who sought to assist the Hutto victims to those victims, or providing authorization forms to the victims for them to sign if they wanted immigration or other assistance.  In fact, the Immigration and Nationality Act specifically provides that "Government entities adjudicating applications for relief under subsection (a)(2) of this section, and government personnel carrying out mandated duties under section 101(i)(1) of the Immigration and Nationality Act (8 U.S.C. § 1101(i)(1)) may, with the prior written consent of the alien involved, communicate with nonprofit, nongovernmental victims' service providers for the sole purpose of assisting victims in obtaining victim services from programs with expertise working with immigrant victims.  8 U.S.C. § 1367.

197.    ICE's deliberate refusal to provide information about direct referral to immigration providers who offered their assistance to unrepresented Hutto victims such as

Raquel, coupled with its failure to notify Hutto victims of the availability of U Visas and its resistance to providing the necessary certification to represented Hutto victims even upon repeated request, is consistent with a pattern of deliberate indifference towards sexual assault in immigration detention and denying victims access to immigration relief and civil redress.

198.    The named plaintiffs had the right to apply for a U Visa, but ICE did not provide them the information and notice necessary to exercise that right.  Defendant Joe Benavides had knowledge of the circumstances sufficient to recognize that the named plaintiffs should be considered for U Visas and had an obligation to give the named plaintiffs notice of that fact or to see that such notice was provided.

### iv.  Other Named Plaintiffs

199.    Like Ms. Raquel Doe, Ms. Anna Roe typifies the victims of crime at issue in this litigation who desperately needed advice and guidance on how to pursue their rights and remedies through a U Visa.  Anna received no schooling at all, whether in her youth or since. She came from a poor fishing family and worked on the beach in her home country of El Salvador cleaning seafood.  When she was beaten mercilessly in her home country, she came to the United States to escape.  When Defendant Dunn assaulted her on December 18, 2009, she had no idea how to seek a remedy or vindicate her rights in any way.  Defendant Joe Benavides and another individual came to Anna's new location and asked her for information regarding Dunn's assault.  She fully cooperated with their investigation.  Defendant Benavides indicated to her that she would be eligible for a U Visa and that he would help her obtain it.  He never did. She called him several times afterwards and asked about her case.  He simply said that the case was fine and that she was fine, but he never offered her any mechanism for moving forward or any information about how she might pursue the U Visa possibility.  Anna received no assistance

in obtaining a U Visa and has not obtained one as of the filing of Plaintiffs' Second Amended Complaint.

200.     Ms. Georgina Roe left school at a fairly young age because of the exigencies of her life in Honduras.  Although she came to the United States to escape physical and sexual abuse in her home country, she quickly found herself the victim of sexual assaults by Defendant Donald Dunn in this country.  Representatives of Williamson County and DHS contacted her as part of their investigation of Donald Dunn and spoke with her for about half an hour.  Defendant Joe Benavides came out to her new location to meet with her for about fifteen minutes.  These individuals did not explain clearly what they wanted, and she was frightened of what impact their questions would have on her immigration situation.  None of these individuals ever mentioned U Visa possibilities to her until right around the time of the filing of this litigation.  Georgina received no assistance in obtaining a U Visa and has not obtained one as of the filing of Plaintiffs' Second Amended Complaint.

201.     Ms. Emily Roe managed to continue her schooling only until she was about 12 years old.  Then, economic realities in her home country of El Salvador induced her to work at selling clothes and vegetables in conditions of substantial poverty.  After severe domestic violence led her to flee to the United States, she found herself victim to Defendant Dunn's sexual assault as well.  She very much needed assistance in seeking a remedy and protection of her rights, as the federal government had promised.  Defendant Joe Benavides showed up unannounced at Emily's new location one day with Defendant John Foster and began asking her questions about the incident with Defendant Dunn.  Emily spoke with them about an hour and gave them her full cooperation.  They left and came back after about a half hour and showed her pictures.  Instead of giving Emily substantive assistance, Defendant Benavides told Emily that

she did not need to look for an attorney.  He said that she did not need to worry, and that he would let her know if her case was going to move forward.  Defendant Benavides never explained how to get a U Visa.  Instead, he kept insisting that she did not need an attorney. Indeed, when Emily finally found an attorney on her own and despite Benavides' protestations, and that attorney asked Benavides to certify the U Visa application for Emily, he refused.  He indicated he would ask his supervisor about it, but neither Emily nor her attorney ever received any indication that this conversation took place or that Benavides would provide any further assistance.  Emily received no assistance in obtaining a U Visa and has not obtained one as of the filing of Plaintiffs' Second Amended Complaint.

202.    Ms. Beth Roe fell into the hands of Defendant Donald Dunn after having escaped from severe hardships in her home country of Honduras and rape during her travels.  After the incident with Donald Dunn, Defendants Benavides and Foster came to Beth's new location. They showed her pictures of Donald Dunn and asked her questions.  She cooperated fully with their investigation.  However, they never talked to her about a U Visa.  As with Plaintiff Emily Roe, Defendant Benavides said that Beth did not need to find a lawyer.  He said that Beth's case was fine, that Beth herself was fine, and that she did not need an attorney.  Beth received no assistance in obtaining a U Visa and has not obtained one as of the filing of Plaintiffs' Second Amended Complaint.

203.    Ms. Constance Roe went to school up through the 8th grade in her home country of Brazil, but had to leave to work as a street vendor in an effort to help mitigate her family's extreme poverty.  She finally had to leave her home country after the physical abuses of her common-law husband rendered it impossible for her to stay.  In this country, Constance experienced assaults both by a new husband and by Defendant Donald Dunn.  After the incident

involving Defendant Dunn, investigators came to meet with her in her new location.  Constance

met with a woman who spoke Spanish and a man who spoke only English.  These individuals

told Constance that Dunn would be indicted and showed her pictures of him.  Constance does not

recall their advising her of the possibility of a U Visa, despite the fact that she cooperated fully

with the investigation.  On information and belief, neither these individuals nor any other

Defendant or employee of Defendants rendered Constance any assistance in obtaining a U Visa

or even provided her with information regarding her eligibility in this regard.

## VIII.  Defendants CCA and Evelyn Hernandez Wrongfully Failed To Protect Plaintiffs from the Obvious Risk of Sexual Assault.

204.    Pursuant to the January 2010 Agreement between Williamson County, Texas, and

Corrections Corporation of America (the "CCA Agreement"), "[f]or every federal detainee

accepted into custody at [Hutto], CCA shall comply with each of the terms and conditions set

forth in the [IGSA] and provide services in strict compliance with the said terms and conditions

of the [IGSA]."  (CCA Agreement, ¶ 2).  CCA was thus contractually bound to comply with the

IGSA's provision that "[d]uring all transportation activities, at least one (1) transportation officer

shall be of the same sex as the residents being transported."

205.    Despite this contractual language and despite the fact that Defendant Evelyn

Hernandez, CCA's facility administrator for Hutto, specifically recognized in a memorandum to

employees dated March 13, 2009, that at least one female staff member had to accompany

female detainees on all transports, including bond-outs, she nevertheless issued Post Order 17 on

March 20, 2009, exactly one week later, omitting any mention of this requirement.

206.    Under Defendant Hernandez's direction, CCA failed to comply with all terms of

its other transportation policies as well.  Policy 9-101, ¶ N.2, for example, required transportation

staff prior to any transport of detainees to provide "Central Control" at Hutto with the "[n]ame of

the person who approved the escort" and the "[n]umber of [the] facility-issued cellular telephone[.]"  Moreover, Policy 9-101, ¶¶ K.3 and S.1, required transport staff to "maintain periodic communication with Central Control at least every (60) minutes, or more as directed by the Shift Supervisor or higher authority, by cellular phone and radio" and to report their odometer readings at the time of each call.  Such policy provisions imply a level of accountability and information exchange not reflected in actual practice.  Indeed, transport logs reflect neither the recording of escort approvers and cellular telephone numbers nor compliance with the periodic communications requirement.

207.    Indeed, on information and belief, officers escorting female immigrant detainees from Hutto to the Airport or to the Austin Greyhound Bus Station were required to log only the most cursory entries in the applicable logbooks, including little more than mileage and time information.  On information and belief, no supervisor reviewed or commented on the log entries, and no supervisor, dispatch agent, or other staff member engaged in and logged any sort of official communications with the escorting officer during the transports themselves.

208.    Such failures to implement policy provisions designed to provide for greater central control over escort officers enhanced the ability of such officers, like Dunn, to commit assaults and sexual assaults against those they were transporting, particularly on the numerous occasions when Dunn and other male officers violated the IGSA and the CCA Agreement by transporting female immigrant detainees without any female escort officer present.

209.    On May 14, 2010, in a Quarterly Staff Recall meeting, Defendant Hernandez informed the staff that, effective May 11, 2010, all transportation of bond-outs would be conducted by female staff.  Hernandez's insistence on compliance with this already existing contractual requirement demonstrates the feasibility of compliance with this requirement.

210.    On May 27, 2010, Defendant Hernandez was put on administrative leave with pay, ostensibly while an investigation was "conducted into an incident concerning a transportation issue at Hutto."  May 27, 2010, Email from Charles Martin to Jose Rosado.  She was demoted on July 12, 2010.  On information and belief, these actions were taken in recognition of her failures to implement contracts, policies, and standards designed to protect the named plaintiffs and other members of the Class from the clear and obvious risk of assault and sexual assault by male escort officers.  On information and belief, Defendant Hernandez's employment with CCA was later terminated.

211.    In a letter dated May 28, 2010, ICE specifically chastised CCA on the basis of its "understand[ing] that [Donald Dunn] was able to commit [the] alleged crimes [against the female detainees referenced above] because ICE mandated transport policies and procedures were not followed."  ICE put CCA on probation, effective immediately, and threatened to terminate "this and every CCA contract with ICE."

212.    On information and belief, ICE has never terminated a contract with CCA on the basis of sexual assault or failure to protect from harm.

213.    In a June 25, 2010, letter to Jerald Neveleff, purporting to respond to ICE's May 24, 2010, letter to Williamson County, CCA admitted that it had an "obligation to provide a transportation process that ensures the safety of the residents entrusted to [its] care[.]"  It also admitted that "current policy clearly states that at least one transportation officer must be the same sex as the resident being transported[.]"  It consequently promised to initiate "disciplinary action . . . against any additional staff members who violated the transportation requirement as set out in CCA policy."  However, despite the fact that at least 22 officers had, in fact, violated this policy between October 19, 2009, and May 7, 2011, on information and belief, CCA did not

pursue a single disciplinary action of any kind against any of these officers.  CCA thus not only violated contracts, policies, and standards designed to protect the named plaintiffs and the other members of the Class from the clear and obvious risk of assault and sexual assault by male escort officers, but it failed to take appropriate remedial steps, thereby communicating that employees who did violate these contracts, policies, and standards may continue to do so with impunity.

## IX.    Defendants Williamson County and John Foster Wrongfully Failed To Protect Plaintiffs from the Obvious Risk of Sexual Assault.

214.    Williamson County was a signatory to both the IGSA with ICE and the contract with CCA governing the Hutto facility.  It thus fully understood and consented to the contractual provisions mandating that "[d]uring all transportation activities, at least one (1) transportation officer shall be of the same sex as the residents being transported."

215.    Williamson County also fully understood its own obligations to see to complete implementation of these contractual provisions.  Indeed, Williamson County assigned a monitor to the Hutto facility and requested "the unabated right to access the entire facility at random times" and "the same access rights that senior level CCA officials have at the facility." November 13, 2007, Email from Hal Hawes to Jerald Neveleff.  On information and belief, Williamson County was allowed to appoint a monitor with these access rights, and Williamson County appointed Defendant John Foster to fill that role.  Moreover, pursuant to the CCA Agreement, ¶ 12, CCA was required to notify Williamson County immediately in event of any sexual assault, thus contemplating Williamson County's involvement in addressing such issues.

216.    Nevertheless, despite their insistence on unabated rights of high-level access, Defendants Williamson County and John Foster allowed repeated violations of applicable contracts, policies, and standards designed to protect the named plaintiffs and other members of the Class from the clear and obvious risk of assault and sexual assault by male escort officers.

217.     In a May 26, 2010, Contract Discrepancy Report, Defendant Rosado notified

Williamson County that it was in violation of the IGSA's mandate that "[d]uring all

transportation activities, at least one (1) transportation officer shall be of the same sex as the

residents being transported."

## X.     ICE Defendants Neveleff, Robertson, and Rosado Wrongfully Failed To Protect Plaintiffs from the Obvious Risk of Sexual Assault.

### A.     General Responsibilities of Defendant Neveleff

218.     As explained in Attachment 1, § 3(c) to the IGSA, as Contracting Officer,

Neveleff was "responsible for the complete conduct and integrity of the contracting process,

including administration after award."  As articulated in Attachment 3, § 1, to the IGSA, "[t]he

role of the Government in quality assurance [was] to ensure performance standards are achieved

and maintained."  As the Contracting Officer, Neveleff had direct obligations to fulfill the role of

the government in this regard.

219.     Under Article II.D of the IGSA, as part of this administration process, Neveleff

was required personally to "approve [CCA's] policies and procedures for use under [the IGSA]."

Likewise, Article XVIII.A of the IGSA mandated that CCA "establish and maintain a complete

Quality Control Program (QCP) acceptable to the Contracting Officer, in consultation with the

COTR, to assure the requirements of [the IGSA] are provided."

220.     In general, Defendant Neveleff recognized that the Hutto facility "house[d]

residents that [were] the ultimate responsibility of ICE, [and that] there [was] a need to make

sure that anything related to the facility [did] not interfere with the best interest and protection of

the residents."  November 9, 2007, Email from Jerald Neveleff to Hal Hawes.

### B.     General Responsibilities of Defendants Robertson and Rosado

221.    As explained in Attachment 1, § 3(c) to the IGSA, Defendants George Robertson

and Jose Rosado, as COTRs, were "employee[s] of ICE responsible for monitoring all technical

aspects and assisting in administering the contract."

222.    As noted in Attachment 3, § 4, of the IGSA, the COTR at Hutto would be an on-

site official, tasked with regular inspections and assessing overall performance by reviewing

specific items in the areas covered by the relevant performance standards and by monitoring

relevant activities at Hutto.

223.    Attachment 3, § 3, of the IGSA required that CCA make a wide variety of

documents available for the COTR's inspection as part of this review and monitoring process,

including, among other things, written policies and procedures, logbooks and other reports, and

contract discrepancy reports ("CDRs").

224.    The IGSA expressly required the COTR to review such documentation "to affirm

that the facility conditions, policies/procedures, and handling of residents all conform to the

performance standards" put forward in the IGSA.  (IGSA, Att. 3, § 4.3.)

## C.    The ICE Defendants' Responsibilities with Respect to Transport Issues

225.    Defendant Jerald Neveleff, as Contracting Officer for ICE, signed the IGSA on

January 27, 2010, and was thus aware of Article III.D of the IGSA, pursuant to which "[d]uring

all transportation activities, at least one (1) transportation officer shall be of the same sex as the

residents being transported."

226.    Neveleff and his COTRs, Defendants Robertson and Rosado, had direct

responsibilities with regard to transport issues.  Under Article III.D of the IGSA, CCA would

provide, "upon request and as scheduled by the COTR or Contracting Officer, necessary escort

and transportation services for residents to and from designated locations."  Moreover, pursuant

to Attachment 1, § 4(b)(21)(b)(1), CCA had to "provide transportation services as may be required to transport residents securely, in a timely manner, to locations as directed by the COTR."  Pursuant to Attachment 1, § 4(b)(21)(b)(4), "[t]ransportation routes and scheduling [had to] be accomplished in the most economical manner as approved by the COTR."

227.    Moreover, pursuant to Attachment 1, § 4(b)(21)(f), to the IGSA, CCA "had to establish a communication system that [had] direct and immediate contact with all vehicles . . . . Upon demand, ICE [would] be provided with [the] current status of all vehicles . . . ."  Thus, the IGSA contemplated the ICE Defendants having direct and personal involvement with details of transports.

**D.    The ICE Defendants' Responsibilities with Respect to Sexual Assault Issues**

228.    In its Performance Requirements Summary (Att. 3, § 9.1), the IGSA references Sexual Assault as an area in which ICE imposed performance standards applicable to the Hutto facility.  Indeed, the IGSA specifically referenced sexual abuse as an event that constituted a failure to meet performance standards and that could trigger immediate contractual penalties. (IGSA, Att. 3, § 6).  Defendants Neveleff, Robertson, and Rosado had direct responsibilities for ensuring that these performance standards were met.

229.    The IGSA further required immediate notice to both the Contracting Officer and the COTR in case of any sexual assault, thus further emphasizing the involvement of these ICE officials in such matters.  (IGSA, Article XVI.F; Att. 3, § 7(c)).

230.    As a general matter, the ICE Defendants recognized, as noted above, that the Hutto facility "house[d] residents that [were] the ultimate responsibility of ICE, [and that] there [was] a need to make sure that anything related to the facility [did] not interfere with the best interest and protection of the residents."  November 9, 2007, Email from Jerald Neveleff to Hal

Hawes.  Sexual assaults by male escort officers against the named plaintiffs and other members

of the Class during transport from the Hutto facility both related to that facility and interfered

with the best interest and protection of the residents.  The ICE Defendants had a direct and

personal responsibility to take the measures necessary to prevent such sexual assaults.

### E.    The ICE Defendants' Failure To Carry out Their Responsibilities

231.    The ICE Defendants allowed repeated violations of applicable contracts, policies,

and standards designed to protect the named plaintiffs and other members of the Class from the

clear and obvious risk of assault and sexual assault by male escort officers.

232.    Had the ICE Defendants not maintained a posture of deliberate indifference with

respect to these violations and the clear and obvious risk of assault and sexual assault attendant

upon them, they could easily have taken preventative measures by insisting on compliance with

the applicable contracts, policies, and standards.

## XI.    Class Allegations

233.    Plaintiffs bring their First, Second, Third, Fifth, Sixth, and Seventh causes of

action as nationwide class action claims pursuant to Fed. R. Civ. P. 23(a) and (b)(3) as

representatives of a proposed Plaintiff Class of immigrant females who (1) were detained at the

Hutto facility between October 19, 2009, and October 19, 2011, (the "Class Period"), (2) were

provided a transport from Hutto during the Class Period by the Defendants, and (3) were

assaulted, sexually assaulted, or sexually abused during the Class Period by a male officer who

provided that transport without any accompanying female officer.

234.    The Plaintiff Class is numerous and joinder of all members is impracticable.

Plaintiffs are informed and believe, and on that basis allege, that during the Class Period, at least

ten women were assaulted or sexually assaulted by Defendant Donald Dunn alone.  Defendant

Dunn himself admitted to Williamson County authorities that he had committed these violations against "numerous" female detainees over the course of his tenure as an employee at the Hutto facility. Moreover, on at least 40 occasions, a single male officer other than Defendant Dunn transported a single female detainee from Hutto during the Class Period, and on at least 29 occasions, a single male officer other than Defendant Dunn transported multiple female detainees during the Class Period.

235. Furthermore, joinder would be impossible with respect to unnamed members of the Class, as they were immigrant detainees who have now left the Hutto facility and could reside anywhere in the country at this point or could even have been deported. In any event, Defendants, and particularly the ICE Defendants, are in the best position to identify and locate unnamed members of the Class.

236. Questions of law and fact common to the Plaintiff Class as a whole include, but are not limited to, the following:

    a. Whether the ICE Defendants exhibited deliberate indifference towards the obvious risk of sexual assault on the Class members by the male officers transporting them without female officer escort in violation of applicable contracts, policies, and standards;

    b. Whether Defendants Williamson County and Corrections Corporation of America maintained or sanctioned official policies, practices, and customs of deliberately indifferent failure to protect the Class members from the obvious risk of sexual assault by the male officers transporting them without female officer escort in violation of applicable contracts, policies, and standards;

c.   Whether Defendants John Foster and Evelyn Hernandez exhibited deliberate indifference towards the obvious risk of sexual assault on the Class members by the male officers transporting them without female officer escort in violation of applicable contracts, policies, and standards;

d.   Whether Defendants Corrections Corporation of America, and Evelyn Hernandez were negligent and/or grossly negligent by allowing male officers to transport the Class members without female officer escort in violation of applicable contracts, policies, and standards;

e.   Whether Defendants Corrections Corporation of America and Evelyn Hernandez were negligent in their supervision of Donald Dunn and other male officers who transported the Class members without female officer escort in violation of applicable contracts, policies, and standards;

f.   Whether Defendants subjected the Class members to cruel, inhuman, and degrading treatment by either (1) assaulting and/or sexually assaulting them, or (2) maintaining a posture of deliberate indifference towards the clear and obvious risk that a male transport officer would assault or sexually assault them under the circumstances at issue in this Complaint.

237.   Plaintiffs and members of the Plaintiff Class are similarly situated and had substantially similar experiences with respect to their treatment at the hands of the Defendants, and the claims of the named plaintiffs are typical of those of the members of the Plaintiff Class.

238.   Plaintiffs will fairly and adequately represent and protect the interests of the members of the Plaintiff Class.  Plaintiffs have retained counsel who are competent and experienced in complex class actions and in civil rights litigation.

239.    Class certification of Plaintiffs' First, Second, Third, Fifth, Sixth, and Seventh causes of action is appropriate pursuant to Fed. R. Civ. P. 23(b)(3) because the prosecution of separate actions by the individual members of the Class would create a risk of inconsistent and/or varying adjudications with respect to the individual members of the Class.

240.    Class certification is also superior to other available means for the fair and efficient adjudication of this controversy.  The complex and extensive litigation necessary to address Defendants' wrongful conduct, as detailed in this Complaint, requires resources beyond those which an individual member of the Class could likely muster.  In addition, individualized litigation would increase the delay and expense to all parties and to the court system resulting from the complex legal and factual issues of this case.

# CAUSES OF ACTION

# FIRST CAUSE OF ACTION

**Deliberately Indifferent Monitoring: Failure To Protect from and/or Remedy Obvious Risk**
Fifth Amendment—U.S.Constitution
(*Bivens* claim on behalf of Class)
Against Defendants: Jerald Neveleff, George Robertson, and Jose Rosado
On behalf of the named plaintiffs and all others similarly situated

241.    Plaintiffs incorporate paragraphs 1 through 240 as set forth above.

242.    As detailed throughout this Complaint, Defendants Jerald Neveleff (as Contracting Officer) and George Robertson and Jose Rosado (as Contracting Officer's Technical Representatives) exhibited deliberate indifference in their respective capacities by (1) willfully blinding themselves to the need to implement steps to prevent sexual assault during transport activities, even when those steps were required by applicable contracts, policies, and standards; and (2) failing appropriately to monitor transport activities which they knew to be proceeding in violation of applicable contracts, policies, and standards, under circumstances in which they

knew that the applicable contracts, policies, and standards were designed to prevent sexual assault on the named plaintiffs and on the other members of the Class.

243.    The risk of assault and sexual assault on the named plaintiffs and other members of the Class under these circumstances was clear, obvious, and ongoing.

244.    As a direct and proximate result of the deliberate indifference of Defendants Jerald Neveleff, George Robertson, and Jose Rosado to the obvious risk of sexual assault on the named plaintiffs and other Class members, the named plaintiffs and all other Class members each suffered substantial injuries and damages, including severe mental and emotional distress.

# SECOND CAUSE OF ACTION

**Policies, Practices, and Customs of Deliberately Indifferent Failure
To Protect from and/or Remedy Obvious Risk**
Fourteenth Amendment and Fifth Amendment, As Incorporated—U.S. Constitution
(42 U.S.C. § 1983 claim on behalf of Class)
Against Defendants: Williamson County and Corrections Corporation of America
On behalf of the named plaintiffs and all others similarly situated

245.    Plaintiffs incorporate paragraphs 1 through 244 as set forth above.

246.    As detailed throughout this Complaint, at all relevant times, or at a minimum from the beginning of the Class Period up until May 7, 2010, Defendants Williamson County and Corrections Corporation of America maintained or sanctioned official policies, practices, and customs of deliberately indifferent failure to protect female immigrant detainees at the Hutto facility from the obvious risk of sexual assault by male escort officers during transport from that facility by (1) failing to implement steps to prevent sexual assault during transport activities, even when those steps were required by applicable contracts, policies, and standards; and (2) failing appropriately to monitor transport activities which Defendants knew to be proceeding in violation of those applicable contracts, policies, and standards, under circumstances in which it

was clear and obvious that the applicable contracts, policies, and standards were designed to prevent sexual assault on the named plaintiffs and on the other members of the Class.

247.    The risk of assault and sexual assault on the named plaintiffs and other members of the Class under these circumstances was clear, obvious, and ongoing.

248.    Those entrusted with policymaking at Williamson County and Corrections Corporation of America during the relevant time period had actual and constructive knowledge of these official policies, practices, and customs of Williamson County and Corrections Corporation of America and had the ability to modify and remedy these policies, practices, and customs.

249.    As a direct and proximate result of the maintenance and sanctioning by Defendants Williamson County and Corrections Corporation of America of these official policies, practices, and customs, the named plaintiffs and all other Class members each suffered substantial injuries and damages, including severe mental and emotional distress.

## THIRD CAUSE OF ACTION
**Deliberately Indifferent Failure To Protect from and/or Remedy Obvious Risk**
Fourteenth Amendment and Fifth Amendment, As Incorporated—U.S. Constitution
(42 U.S.C. § 1983 claim on behalf of the Class)
Against Defendants: John Foster and Evelyn Hernandez
On behalf of the named plaintiffs and all others similarly situated

250.    Plaintiffs incorporate paragraphs 1 through 249 as set forth above.

251.    As detailed throughout this Complaint, Defendants John Foster and Evelyn Hernandez exhibited deliberate indifference in their respective capacities by (1) willfully blinding themselves to the need to implement steps to prevent sexual assault during transport activities, even when those steps were required by applicable contracts, policies, and standards; and (2) failing appropriately to monitor transport activities which they knew to be proceeding in violation of applicable contracts, policies, and standards, under circumstances in which they

knew that the applicable contracts, policies, and standards were designed to prevent sexual

assault on the named plaintiffs and on the other members of the Class.

252.    The risk of assault and sexual assault on the named plaintiffs and other members

of the Class under these circumstances was clear, obvious, and ongoing.

253.    As a direct and proximate result of the deliberate indifference of Defendants John

Foster and Evelyn Hernandez to the obvious risk of sexual assault on the named plaintiffs and

other Class members, the named plaintiffs and all other Class members each suffered substantial

injuries and damages, including severe mental and emotional distress.

## FOURTH CAUSE OF ACTION
### Deprivation of Due Process Under Color of Law
Fourteenth Amendment and Fifth Amendment, As Incorporated—U.S. Constitution
(42 U.S.C. § 1983 claim on behalf of named plaintiffs only)
Against Defendant Donald Dunn
On behalf of the named plaintiffs

254.    Plaintiffs incorporate paragraphs 1 through 253 as set forth above.

255.    As detailed throughout this Complaint, while acting under color of law,

Defendant Donald Dunn willfully subjected the named plaintiffs and other members of the Class

to the deprivation of their rights, privileges, and immunities secured by the Constitution and laws

of the United States, by assaulting and sexually assaulting them by touching and fondling parts

of their body without authority to do so and without their consent and by acting in such a manner

as to cause them to fear rape and other consequences if they failed to comply with his demands.

256.    Defendant Dunn's conduct violated the rights of the named plaintiffs and other

members of the Class not to be deprived of liberty without due process of law, which includes

the right to bodily integrity.

257.    As a direct and proximate result of Defendant Dunn's deprivation of their liberty

without due process of law during the course of these assaults and sexual assaults, the named

plaintiffs each suffered substantial injuries and damages, including severe mental and emotional distress.

# FIFTH CAUSE OF ACTION

### Negligence and Gross Negligence
(State law claim on behalf of Class)
Against Defendants: Corrections Corporation of America, and Evelyn Hernandez
On behalf of the named plaintiffs and all others similarly situated

258.    Plaintiffs incorporate paragraphs 1 through 257 as set forth above.

259.    As the corporation managing the Hutto facility and as the facility administrator of the Hutto facility respectively, Defendants Corrections Corporation of America and Evelyn Hernandez owed a legal duty to the named plaintiffs and to all other members of the Class to ensure implementation of and adherence to the applicable contracts, policies, and standards designed to prevent sexual assault on the named plaintiffs and on the other members of the Class.

260.    As detailed throughout this Complaint, Defendants Corrections Corporation of America and Evelyn Hernandez breached this duty to the named plaintiffs and to all other members of the Class by exhibiting deliberate indifference to the obvious risk of sexual assault on female immigrant detainees by male escorting officers during transport and by, as a consequence of this deliberate indifference, failing to ensure that at least one female escort officer attended any transport of female detainees from the Hutto facility, as required by applicable contracts, policies, and standards.

261.    When viewed objectively from the standpoint of the actor at the time of these breaches of duty, the breaches of duty involved an extreme degree of risk, considering the probability and magnitude of the harm to the named plaintiffs and the other members of the Class.

262.    As detailed throughout this Complaint, at the time of these breaches of duty,

Defendants Corrections Corporation of America and Evelyn Hernandez had actual, subjective

awareness of the risk involved, but nevertheless proceeded with conscious indifference to the

rights of the named plaintiffs and the other members of the Class.

263.    As a direct and proximate result of Defendants' cruel, inhuman, and degrading

treatment of them, the named plaintiffs each suffered substantial injuries and damages, including

severe mental and emotional distress.

### SIXTH CAUSE OF ACTION
**Negligent Supervision**
(State law claim on behalf of Class)
Against Defendants: Corrections Corporation of America and Evelyn Hernandez
On behalf of the named plaintiffs and all others similarly situated

264.    Plaintiffs incorporate paragraphs 1 through 263 as set forth above.

265.    As detailed throughout this Complaint, Defendants Corrections Corporation of

America and Evelyn Hernandez breached their duty to the named plaintiffs and to the Class of

protecting them from sexual assault during transport from the Hutto facility by failing

appropriately to supervise the male escort officers, including Defendant Donald Dunn, who

repeatedly and persistently violated the applicable contracts, policies, and standards designed to

prevent such sexual assault.

266.    As a direct and proximate result of the breach of this duty by Defendants

Corrections Corporation of America and Evelyn Hernandez, the named plaintiffs each suffered

substantial injuries and damages, including severe mental and emotional distress.

# SEVENTH CAUSE OF ACTION
**Cruel, Inhuman, and Degrading Treatment**
(28 U.S.C. § 1350 claim on behalf of Class)
Against Defendants Dunn and CCA
On behalf of the named plaintiffs and all others similarly situated

267.     Plaintiffs incorporate paragraphs 1 through 266 as set forth above.

268.     The named plaintiffs and all other members of the Class are aliens for purposes of 28 U.S.C. § 1350.

269.     The named plaintiffs and all other members of the Class assert claims in tort against Defendants Dunn and CCA based on their cruel, inhuman, or degrading treatment at the hands of Defendant Dunn and/or other agents of CCA.

270.     As detailed throughout this Complaint, Plaintiffs were subjected to cruel, inhuman, or degrading treatment by Defendant Dunn and/or other agents of CCA.  Customary international law prohibits any act which has the intent and the effect of grossly humiliating and debasing an individual, forcing that individual to act against his or her will or conscience, inciting fear or anguish and/or breaking his or her physical and moral resistance.  The prohibition against cruel, inhuman, or degrading treatment is a "specific, universal, and obligatory" norm of customary international law cognizable under the Alien Tort Statute.

271.     Under the circumstances, the assault and sexual assault of Plaintiffs by Defendant Dunn and/or other agents of CCA while they were under the custody and control of CCA generally, and the custody of Dunn himself and/or other agents of CCA specifically, violates the norm prohibiting cruel, inhuman, or degrading treatment and is cognizable under the Alien Tort Statute.

272.     As detailed throughout this Complaint, Defendant Dunn subjected named plaintiffs and other members of the Class to cruel, inhuman, or degrading treatment by assaulting and sexually assaulting them.  At the time Plaintiffs were assaulted and sexually assaulted, Defendant Dunn was an employee of Defendant CCA.  Defendant CCA is thus directly liable for Defendant Dunn's unlawful acts because Defendant Dunn was an agent of CCA and because he

was acting within the scope of his office or employment during the transports in which these assaults and sexual assaults occurred and/or Defendant CCA was reckless in its posture of deliberate indifference towards the obvious risk of sexual assault.

273.    Further, or in the alternative, Defendant CCA is liable for Plaintiffs' cruel, inhuman, or degrading treatment because it demonstrated a reckless disregard as to whether Plaintiffs would be subjected to such treatment by Defendant Dunn and/or other CCA agents: (1) by exhibiting deliberate indifference to the obvious risk of sexual assault during transport activities; (2) by adopting policies, practices, and customs which institutionalized and otherwise furthered this posture of deliberate indifference; (3) by willfully blinding themselves to the need to implement steps to prevent sexual assault during transport activities, even when those steps were required by applicable contracts, policies, and standards; and (4) by failing appropriately to monitor transport activities which it knew to be proceeding in violation of applicable contracts, policies, and standards, under circumstances in which it knew that the applicable contracts, policies, and standards were designed to prevent sexual assault on the named plaintiffs and on the other members of the Class.

274.    As a direct and proximate result of their cruel, inhuman, and degrading treatment at the hands of Defendant Dunn and Defendant CCA, the named plaintiffs and other members of the Class each suffered substantial injuries and damages, including severe mental and emotional distress.

275.    The acts or omissions of Defendant Dunn and Defendant CCA were deliberate, willful, intentional, wanton, malicious, and oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

# EIGHTH CAUSE OF ACTION
**Assault and Sexual Assault**
Against Defendant Donald Dunn
On behalf of the named plaintiffs only

276.     Plaintiffs incorporate paragraphs 1 through 275 as set forth above.

277.     As detailed throughout this Complaint, Defendant Donald Dunn assaulted and sexually assaulted the named plaintiffs by touching and fondling parts of their body without authority to do so and without their consent and by acting in such a manner as to cause them to fear rape and other consequences if they failed to comply with his demands.

278.     Defendant Dunn acted intentionally and knowingly in committing these assaults and sexual assaults against the named plaintiffs.  Indeed, Defendant Dunn admitted to Williamson County authorities that his actions were designed only for his own self gratification and not for any legitimate purpose.

279.     Defendant Dunn made contact with the persons of the named plaintiffs by touching and fondling parts of their body during the course of these assaults and sexual assaults.

280.     Defendant Dunn knew or reasonably should have believed that the named plaintiffs would regard his contact with their persons during the course of these assaults and sexual assaults as offensive or provocative.

281.     As a direct and proximate result of Defendant Dunn's contacts with the persons of the named plaintiffs during the course of these assaults and sexual assaults, the named plaintiffs each suffered substantial injuries and damages, including severe mental and emotional distress.

282.     Defendant Dunn engaged in this conduct with malice and reckless or callous indifference to the rights of the named plaintiffs.

# NINTH CAUSE OF ACTION
**False Imprisonment**
Against Defendant Donald Dunn
On behalf of the named plaintiffs only

283.     Plaintiffs incorporate paragraphs 1 through 282 as set forth above.

284.     As detailed throughout this Complaint, Defendant Donald Dunn falsely imprisoned the named plaintiffs by willfully detaining them without their consent, and in the absence of any authority to do so, by deviating from the plan of his authorized transports of the named plaintiffs and by forcing them to leave the applicable transport vehicle and to assume positions which would facilitate his assaults and sexual assaults upon them.

285.     The named plaintiffs knew that they were willfully and unlawfully detained by Defendant Dunn at the time of his assaults and sexual assaults upon them and they did not consent to it.

286.     Defendant Dunn's willful detention of the named plaintiffs was without legal authority or justification.

287.     As a direct and proximate result of Defendant Dunn's contacts with the persons of the named plaintiffs during the course of these assaults and sexual assaults, the named plaintiffs each suffered substantial injuries and damages, including severe mental and emotional distress.

288.     Defendant Dunn engaged in this conduct with malice and reckless or callous indifference to the rights of the named plaintiffs.

# TENTH CAUSE OF ACTION

**Violation of Procedural Due Process**
Fifth Amendment—U.S.Constitution
(*Bivens* claim on behalf of Plaintiff Sarah Doe, Plaintiff Raquel Doe, Plaintiff Anna Roe,
Plaintiff Emily Roe, Plaintiff Beth Roe, and Plaintiff Constance Roe)
Against Defendant: Joe Benavides

289.     Plaintiffs incorporate paragraphs 1 through 288 as set forth above.

290.     As detailed throughout this Complaint, Plaintiffs Sarah Doe, Raquel Doe, Anna Roe, Emily Roe, Beth Roe and Constance Roe provided evidence used as part of the criminal case against Defendant Donald Dunn.

291.     Plaintiffs Sarah Doe, Raquel Doe, Anna Roe, Emily Roe, Beth Roe, and Constance Roe were each the victim of a qualifying criminal activity for U Visa application purposes and suffered a substantial physical or mental abuse as a result of the crime.

292.     Plaintiffs Sarah Doe, Raquel Doe, Anna Roe, Emily Roe, Beth Roe, and Constance Roe each possess and at relevant times possessed credible and reliable information about the qualifying criminal activity for U Visa application purposes.

293.     Plaintiffs Sarah Doe, Raquel Doe, Anna Roe, Emily Roe, Beth Roe, and Constance Roe each have been helpful to the investigation and/or prosecution of the qualifying criminal activity for U Visa application purposes.

294.     Plaintiffs Sarah Doe, Raquel Doe, Anna Roe, Emily Roe, Beth Roe, and Constance Roe are each the victim of a criminal activity that violated U.S. law.

295.     Congress effectively created a right to apply for a U Visa through the articulation of relevant procedures in 8 U.S.C. § 1101 (a)(15)(u) and 8 U.S.C. § 1184(p)(1), among others.

296.     In creating this right, Congress contemplated and intended its exercise by precisely such individuals as Plaintiffs Sarah Doe, Raquel Doe, Anna Roe, Emily Roe, Beth Roe, and Constance Roe.

297.     By knowingly and deliberately withholding notice of the U Visa option, Defendant Joe Benavides effectively violated the right to apply for the U Visa of Plaintiffs Sarah Doe, Raquel Doe, Anna Roe, Emily Roe, Beth Roe, and Constance Roe.

298.     As a direct and proximate result of this rights violation, Plaintiffs Sarah Doe, Raquel Doe, Anna Roe, Emily Roe, Beth Roe, and Constance Roe suffered injuries.

## DEMAND FOR JURY TRIAL

299.     Plaintiffs respectfully demand a jury trial on all claims.

## PRAYER FOR RELIEF

300.     Wherefore, Plaintiffs respectfully request that, after due proceedings, judgment be entered in favor of Plaintiffs and against all Defendants, jointly and severally, and that the Court award the following relief to Plaintiffs:

- All compensatory damages reasonable under the circumstances;

- Punitive damages against Corrections Corporation of America and all individual Defendants sued under 42 U.S.C. § 1983 or 28 U.S.C. § 1350;

- Exemplary damages against Corrections Corporation of America and all individual Defendants sued for gross negligence;

- Reasonable attorneys' fees and court costs under 42 U.S.C. § 1988, 5 U.S.C. § 504, and other applicable law;

- Legal interest on all damages awarded from the date of judicial demand until paid; and

- Such other and further relief as this Court deems just and proper.

Dated:  May 5, 2012

Respectfully Submitted,

 /s/ Mark Whitburn_____

**Attorneys for Plaintiffs**

**Mark Whitburn**
Texas Bar No. 24042144
**Whitburn & Pevsner, PLLC**
P.O. Box 270247
Austin, Texas 78727
Tel: (682) 521-4789
Fax: (512) 519-2098
mwhitburn@whitburnpevsner.com

**Lisa Graybill**
Texas Bar No. 24054454
(Of Counsel)
**Whitburn & Pevsner, PLLC**
P.O. Box 270247
Austin, Texas 78727
Tel: (512) 478-7300
Fax: (512) 519-2098

## CERTIFICATE OF SERVICE

I hereby certify that on May 5, 2012, the foregoing document was served on all counsel of record via the ECF filing system.

 /s/ Mark Whitburn_____
Mark Whitburn